# EXHIBIT A

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

Michael Shklovsky (SBN 255893)
Anderson Zeigler, A Professional Corp.
50 Old Courthouse Sq., 5th Fl.
Santa Rosa, CA 95404

TELEPHONE NO.: (707) 545-4910   FAX NO. *(Optional):* (707) 544-0260
E-MAIL ADDRESS: mshklovsky@andersonzeigler.com
ATTORNEY FOR *(Name):* David Pratt

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Sonoma
STREET ADDRESS: 600 Administration Drive
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Rosa, CA 95403
BRANCH NAME:

**ELECTRONICALLY FILED**
**Superior Court of California**
**County of Sonoma**
**6/15/2022 2:49 PM**
**By: Cyndi Nguyen, Deputy Clerk**

CASE NAME: David Pratt v. Robert C. Higgins, Sharon E. Higgins, 3G
Green Garden Group, Inc., Emerald Harvest, Inc., et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: SCV-271011 |
|---|---|---|
| ☒ Unlimited ☐ Limited (Amount demanded exceeds $25,000) (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☒ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☒ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☒ monetary b. ☒ nonmonetary; declaratory or injunctive relief c. ☒ punitive
4. Number of causes of action *(specify):* 9, See Attachment 4
5. This case ☐ is ☒ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 6/15/2022

Michael Shklovsky
(TYPE OR PRINT NAME)

DocuSigned by:
*Michael Shklovsky*
0D93FCDE56FC468
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev. September 1, 2021] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10 *www.courts.ca.gov* |
|---|---|---|

CEB | Essential Forms
ceb.com

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
   Damage/Wrongful Death
Uninsured Motorist (46) *(if the
   case involves an uninsured
   motorist claim subject to
   arbitration, check this item
   instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
   Asbestos Property Damage
   Asbestos Personal Injury/
      Wrongful Death
Product Liability *(not asbestos or
   toxic/environmental)* (24)
Medical Malpractice (45)
   Medical Malpractice–
      Physicians & Surgeons
   Other Professional Health Care
      Malpractice
Other PI/PD/WD (23)
   Premises Liability (e.g., slip
      and fall)
   Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
   Intentional Infliction of
      Emotional Distress
   Negligent Infliction of
      Emotional Distress
   Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
   Practice (07)
Civil Rights (e.g., discrimination,
   false arrest) *(not civil
   harassment)* (08)
Defamation (e.g., slander, libel)
   (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
   Legal Malpractice
   Other Professional Malpractice
      *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
   Breach of Rental/Lease
      Contract *(not unlawful detainer
         or wrongful eviction)*
   Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
   Negligent Breach of Contract/
      Warranty
   Other Breach of Contract/Warranty
Collections (e.g., money owed, open
   book accounts) (09)
   Collection Case–Seller Plaintiff
   Other Promissory Note/Collections
      Case
Insurance Coverage *(not provisionally
   complex)* (18)
   Auto Subrogation
   Other Coverage
Other Contract (37)
   Contractual Fraud
   Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
   Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
   Writ of Possession of Real Property
   Mortgage Foreclosure
   Quiet Title
   Other Real Property *(not eminent
      domain, landlord/tenant, or
      foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
   drugs, check this item; otherwise,
   report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
   Writ–Administrative Mandamus
   Writ–Mandamus on Limited Court
      Case Matter
   Writ–Other Limited Court Case
      Review
Other Judicial Review (39)
   Review of Health Officer Order
   Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
   *(arising from provisionally complex
   case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
   Abstract of Judgment (Out of
      County)
   Confession of Judgment *(non-
      domestic relations)*
   Sister State Judgment
   Administrative Agency Award
      *(not unpaid taxes)*
   Petition/Certification of Entry of
      Judgment on Unpaid Taxes
   Other Enforcement of Judgment
      Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
   above)* (42)
   Declaratory Relief Only
   Injunctive Relief Only *(non-
      harassment)*
   Mechanics Lien
   Other Commercial Complaint
      Case *(non-tort/non-complex)*
   Other Civil Complaint
      *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
   Governance (21)
Other Petition *(not specified
   above)* (43)
   Civil Harassment
   Workplace Violence
   Elder/Dependent Adult
      Abuse
   Election Contest
   Petition for Name Change
   Petition for Relief from Late
      Claim
   Other Civil Petition

**CEB | Essential**
   ceb.com | **Forms**       **CIVIL CASE COVER SHEET**

**MC-025**

| SHORT TITLE:<br>Pratt v Emerald Harvest | CASE NUMBER: |
|---|---|

**ATTACHMENT** *(Number):* __4__

*(This Attachment may be used with any Judicial Council form.)*

COA1. Breach of Fiduciary Duty
COA2. Breach of Duty of Good Faith and Fair Dealing
COA3. Receiving Improper Distributions
COA4. Unjust Enrichment and Restitution
COA5. Conversion
COA6. Concealment
COA7. Accounting
COA8. Dissociation
COA9. Appointment of Receiver

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page _____ of _____
*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
**to Judicial Council Form**

www.courtinfo.ca.gov

CEB · Essential
ceb.com · Forms

Pratt, David

ELECTRONICALLY FILED
Superior Court of California
County of Sonoma
6/15/2022 2:49 PM
By: Cyndi Nguyen, Deputy Clerk

1  Michael Shklovsky, Esq. (Bar No. 255893)
   Rose M. Zoia, Esq. (Bar No. 134759)
2  Christopher M. Mazzia, Esq. (Bar No. 95513)
   ANDERSON ZEIGLER
3  A Professional Corporation
   50 Old Courthouse Square, 5th Floor
4  Santa Rosa, CA 95404
   Telephone:   707/545-4910
5  Facsimile:    707/544-0260
   Email:       mshklovsky@andersonzeigler.com
6                rzoia@andersonzeigler.com
                 cmazzia@andersonzeigler.com
7
   Attorneys for Plaintiff David Pratt
8

9           **SUPERIOR COURT, SONOMA COUNTY, CALIFORNIA**

10                                          SCV-271011
                                          Case No.

11  DAVID PRATT, an individual,           **VERIFIED DERIVATIVE**
    derivatively on behalf of 3G GREEN    **COMPLAINT FOR:**
12  GARDEN GROUP, LLC D.B.A.
    EMERALD HARVEST, a California         **1. Breach of Fiduciary Duty**
13  Limited Liability Company,            **2. Breach of Duty of Good Faith and**
                                             **Fair Dealing**
14          Plaintiff,                     **3. Receiving Improper Distributions**
                                          **4. Unjust Enrichment and Restitution**
15          vs.                            **5. Conversion**
                                          **6. Concealment**
16  ROBERT C. HIGGINS, an individual;     **7. Accounting**
    SHARON E. HIGGINS, an individual;     **8. Dissociation**
17  3G GREEN GARDEN GROUP, INC.,          **9. Appointment of Receiver**
    a Canadian Corporation; EMERALD
18  HARVEST, INC., a Canadian
    Corporation; and DOES 1 through 50,
19  inclusive,                            [UNLIMITED CIVIL]

20          Defendants,                    **Jury Trial Demanded**

21          -and-

22  3G GREEN GARDEN GROUP, LLC
    D.B.A. EMERALD HARVEST, a
23  California Limited Liability Company,

24          Nominal Defendant.

25

26

27

28

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

ANDERSON ZEIGLER
A PROFESSIONAL CORPORATION, ATTORNEYS AT LAW
P.O. BOX 1498, SANTA ROSA, CALIFORNIA 95402-1498
TEL (707) 545-4910  FAX (707) 544-0260

Plaintiff David Pratt hereby brings this action derivatively on behalf of the nominal defendant 3G Green Garden Group, LLC d.b.a. Emerald Harvest, and complains against the defendants and alleges as follows:

## THE PARTIES

1.      Plaintiff David Pratt ("Mr. Pratt" or "Plaintiff") is now, and at all times relevant herein was, a resident of Sonoma County in the State of California.

2.      Plaintiff is informed and believes, and thereon alleges, that defendant Robert C. Higgins ("Mr. Higgins") is now, and at all times relevant herein was, a resident of British Columbia, Canada.

3.      Plaintiff is informed and believes, and thereon alleges, that defendant Sharon E. Higgins, a.k.a. Sharon E. Girard ("Mrs. Higgins") is now, and at all times relevant herein was, a resident of British Columbia, Canada.  Mrs. Higgins is married to Mr. Higgins.

4.      Plaintiff is informed and believes, and thereon alleges, that defendant Emerald Harvest, Inc. ("EHI") is now, and at all times relevant herein was, a corporation duly formed and incorporated under the laws of British Columbia, Canada. Plaintiff is informed and believes, and thereon alleges, that EHI is doing business in Sonoma County in the State of California.

5.      Plaintiff is informed and believes, and thereon alleges, that defendant 3G Green Garden Group, Inc. ("3GI") is now, and at all times relevant herein was, a corporation duly formed and incorporated under the laws of British Columbia, Canada. Plaintiff is informed and believes, and thereon alleges, that 3GI is doing business in Sonoma County in the State of California.

6.      Plaintiff is informed and believes, and thereon alleges, that nominal defendant 3G Green Garden Group, LLC d.b.a. Emerald Harvest ("3GL") is now, and at all times relevant herein was, a manager-managed limited liability company duly formed under the laws of the State of California and doing business in Sonoma County

in the State of California, with its principal place of business located at 1399 Corporate Center Parkway, Santa Rosa, CA 95407.  Now, and at all times relevant herein, Mr. Higgins has been the manager of 3GL and held a 51% member interest in 3GL, and Mr. Pratt has held a 25% member interest in 3GL.  Since approximately February 2015, Mrs. Higgins has held a 24% member interest in 3GL, which interest was unilaterally assigned by Mr. Higgins to Mrs. Higgins as discussed below.

7.     Plaintiff does not know the true names and capacities, whether individual, corporate, partnership, joint venture, or otherwise, of the defendants sued herein as DOES 1 through 50, inclusive ("DOE Defendants"), and therefore sues said defendants by such fictitious names pursuant to the provisions of Code of Civil Procedure section 474.  Plaintiff is informed and believes, and thereon alleges, that each of these DOE Defendants is responsible in some manner for the acts and damages alleged herein, including through an agency and/or conspiracy relationship, and Plaintiff will amend this Complaint to allege the true names and capacities of the DOE Defendants when ascertained, together with appropriate charging allegations.

**AGENCY**

8.     Plaintiff is informed and believes, and thereon alleges, that in doing the tortious acts, breaches of contract, and other conduct alleged herein, each of the defendants was the agent, employee and/or in control of each other, directly or indirectly, and acted as agent for one another, and in doing the things alleged herein was acting within the scope of that agency and employment and with the permission and consent of their co-defendants.  Plaintiff is informed and believes, and thereon alleges, that each of the defendants is responsible for the acts or omissions of any person or entity working for such defendant, either directly or indirectly, who may have been employed on such defendant's behalf.

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

**JURISDICTION AND VENUE**

9.     This Court has jurisdiction over the subject matter of this case pursuant to California Code of Civil Procedure section 410.10.  The amount in controversy exceeds $25,000.

10.     The Court also has jurisdiction over this derivative action pursuant to Corporations Code section 17709.02:

      a.   All breaches of fiduciary duty, mismanagement and other acts of misfeasance alleged herein against Mr. Higgins and Mrs. Higgins have occurred and continue to occur while Plaintiff has been and remains a 25% member of record of 3GL; and

      b.   As alleged with particularity below, Plaintiff has made a number of unsuccessful efforts to secure appropriate remedial measures from Mr. Higgins and Mrs. Higgins, as well as provided to them and other named defendants herein the draft of this Complaint in advance of its filing.  This legal action was filed after Mr. Higgins and Mrs. Higgins did not act to protect the interests of 3GL's members.

11.     This derivative action is properly venued in Sonoma County Superior Court under California Code of Civil Procedure section 395(a) because: (1) 3GL's principal place of business is in Sonoma County, California; (2) at least some of the contracts at issue herein were entered into and were to be performed in Sonoma County, California; (3) on information and belief, both EHI and 3GI are doing business in Sonoma County in the State of California; and (4) at least some of the tortious acts and other wrongs alleged herein have occurred in Sonoma County, California.  Given the real and substantial connection which exists between Sonoma County, California, and the facts of this matter, no court other than the Sonoma County Superior Court is a more appropriate forum for the litigation of this action.

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

## BACKGROUND FACTS

### A.    Early Days of the Business

12.    On or about January 20, 2014, Mr. Higgins and Mrs. Higgins approached Mr. Pratt with a proposal that they start a new business that would develop, manufacture and sell advanced fertilizers for plants, with a focus on marketing the products of the business to hydroponic and specialty high value agricultural suppliers in the United States and abroad.

13.    At the time, Mr. Pratt had significant expertise in the development and marketing of plant fertilizers, and he had extensive world-wide marketing experience and connections in the hydroponic agricultural industry.

14.    Within days, Mr. Higgins, Mrs. Higgins and Mr. Pratt reached an agreement to form a business that would take the form of a California limited liability company on the following terms ("the Agreement"):

a.  The principal place of business would be located in Santa Rosa, California, with an administrative office to be eventually opened in British Columbia, Canada.

b.  Mr. Higgins would hold 51% of the membership interest in the business and serve as the manager and Chief Executive Officer, in charge of financial affairs and management of the business, performing much of his work from British Columbia, Canada.

c.  Mr. Pratt would hold 25% membership interest in the business and serve as the President to oversee the buildout of production facilities in Santa Rosa, California, spearhead the development of fertilizer formulas, and head the sales team once the product was ready for market.

d.  Mrs. Higgins would not have an ownership interest but would be in charge of accounting, records keeping, logistics and procurement of materials needed for the manufacture of plant fertilizers.

e.   The remaining 24% of ownership interest would be "reserved" and
distributed over time, with the consent of Mr. Higgins and Mr. Pratt,
to various team members of the business to incentivize and reward
key personnel.

f.   Mr. Higgins and Mr. Pratt would provide the initial owner
contributions needed to get the business off the ground, with said
contributions to be repaid from the profits of the business.

g.   Net profits of the business would be distributed to its owners in
accordance with and proportionate to their ownership interest.

15.   To implement the terms of the Agreement, on or about January 27, 2014,
Mr. Pratt formed 3GL by filing Articles of Organization with the California Secretary
of State.  Since its formation, 3GL operated without a signed Operating Agreement.

16.   Mr. Pratt spent the next several months setting up 3GL's business
operations in Santa Rosa, California.  His efforts included, but were not limited to:

a.   Recruiting and working with specialists to develop from scratch
multiple formulas for plant fertilizers;

b.   Registering several domain names to be used for a business website;

c.   Securing a commercial lease at 1399 Corporate Center Parkway in
Santa Rosa, with Mr. Pratt as the signatory thereunder;

d.   Opening a company bank account with the Wells Fargo Bank;

e.   Retaining trademark legal counsel to begin the process of applying for
trademark registrations with the United States Patent and Trademark
Office ("USPTO") for proprietary product names;

f.   Working with governmental agencies to obtain land use permits
including the initial Zoning Clearance and the Conditional Use
Permit;

g.   Securing a California Reseller's Permit;

h.   Obtaining liability insurance;

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

       i.   Providing feedback on the work of a graphic designer, Christopher Bullock, who was hired to create original artwork for 3GL's product labels, packaging and promotions;

       j.   Setting up internet, phone and utilities accounts for the 1399 Corporate Center Parkway location;

       k.   Sourcing manufacturing materials and equipment; and

       l.   Recruiting product development, manufacturing, warehousing, marketing and sales teams.

17.    On or about March 11, 2014, 3GL applied for registration with the USPTO of its "EMERALD HARVEST" trademark.  The first use date was declared as August 1, 2014.   The EMERALD HARVEST mark was registered on May 26, 2015 (Reg. No. 4,744,844).  Over the years, 3GL filed approximately 25 additional trademark applications.  Six of those additional 3GL trademarks were ultimately registered by the USPTO.

18.    Plaintiff is informed and believes, and thereon alleges, that in further implementation of the Agreement, on or about April 30, 2014, Mr. Higgins registered a partnership in British Columbia, Canada, by the name of 3G Green Garden Group ("3GP").  The registration reflected the names of three (3) individual partners: Mr. Higgins, Mrs. Higgins and Mr. Pratt.

19.    In June 2014, Mr. Pratt and Mr. Higgins travelled to Toronto, Canada, to attend a meeting with a powerful group of industry leaders with significant investments in the hydroponics industry to explore consulting and wholesale opportunities in Canada and elsewhere.

20.    By mid-July 2014, 3GL was producing sufficient volumes of fertilizer test batches, enabling the business to begin field trials on large-scale hydroponic farms in Northern California, the owners of which who volunteered to participate because of their familiarity with Mr. Pratt.  3GL fertilizer product performed exceptionally well out of the gate.

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

21.     By early November 2014, product labels depicting Mr. Bullock's artwork were ready and 3GL started registering its products in different states across the United States.  The labels displayed the name of the manufacturer as "Emerald Harvest, a division of 3G Green Garden Group LLC."

22.     Plaintiff is informed and believes, and thereon alleges, that on or about December 15, 2014, Mr. Higgins registered EHI (defendant Emerald Harvest, Inc.) as a Canadian corporation with offices in British Columbia, Canada.  The registration listed Mr. Higgins as the sole officer and director of EHI.  At the time, Mr. Higgins did not inform Mr. Pratt of this business registration, or consult with him as a member of 3GL prior to registering EHI.

23.     Plaintiff is informed and believes, and thereon alleges, that the creation by Mr. Higgins of a Canadian corporation with the same name as 3GL's brand name, trademark and soon-to-be registered DBA was intentionally done for the purpose of confusing and misleading the marketplace, Mr. Pratt and other individuals and business entities involved or doing business with 3GL.  For example, Mr. Higgins would routinely utilize in his business emails a signature block that showed him as the CEO of "Emerald Harvest," without indicating whether he was referring to 3GL or EHI.

24.     As of the end of 2014, Mr. Pratt had advanced approximately $235,000 in start-up capital for 3GL, without any reimbursements or payment for his work.

25.     Plaintiff is informed and believes, and thereon alleges, that in or before February 2015, Mr. Higgins unilaterally granted the reserved 24% membership interest in 3GL to his wife, Mrs. Higgins.  This action was done without proper notice or a vote by the members of 3GL.  Mr. Pratt learned about this transfer after the fact, through one of Mrs. Higgins' email communications.

26.     On or about February 18, 2015, 3GL filed a fictitious business name statement with the Sonoma County Clerk for "Emerald Harvest."

27.     On or about February 20, 2015, 3GL filed a Statement of Information with the California Secretary of State that listed Mr. Higgins as the Chief Executive

Officer, Mrs. Higgins as a Member, and Mr. Pratt as a Member, Agent for Service of Process and the President of 3GL.

28. On or about April 20, 2015, 3GL launched the Emerald Harvest brand and its family of fertilizer products at the High Times Cup in Denver, Colorado, as well as through its website.

29. In or about June 2015, at the insistence of Mr. Higgins, 3GL switched the domain name for its website from "3ggreengardengroup.com" to "emeraldharvest.co," with the new domain hosted in Canada.

30. Plaintiff is informed and believes, and thereon alleges that there was no compelling business need to host 3GL's website in Canada, but it was done because Mr. Higgins wanted himself and/or EHI to have complete control over the domain name and management of the website.

**B.** **Mr. Higgins Diverts 3GL's Resources In Advanced Nutrients Litigation**

31. Plaintiff is informed and believes, and thereon alleges, that in or about March of 2015, Mr. Higgins' attention was diverted by a series of lawsuits filed in California, Canada and Bulgaria by his former employer, Advanced Nutrients Ltd., a Canadian corporation, and Advanced Nutrients US LLC, a Washington limited liability company (collectively, "Advanced Nutrients"), stemming from alleged improprieties in the manner in which Mr. Higgins left Advanced Nutrients Ltd. ("AN Litigation").

32. Plaintiff is informed and believes, and thereon alleges, that Mr. Higgins was a co-founder, shareholder and President of Advanced Nutrients Ltd. before his departure from the company. As Plaintiff later discovered, at the time when Mr. Higgins proposed to Mr. Pratt to partner on a new nutrients business, Mr. Higgins did not properly disclose to Mr. Pratt the legal risks associated with the circumstances of his then recent departure from Advanced Nutrients.

33.     Prior to 2014, Mr. Pratt worked for several years as a sales representative for Advanced Nutrients US LLC.  Several other 3GL employees also worked at Advanced Nutrients prior to joining 3GL.

34.     While Mr. Higgins was the principal target of the AN Litigation, the California action (Sonoma County Superior Court, Case No. SCV-256825 ("the CA Action"), dismissed without prejudice on or about January 8, 2016) also named 3GL, Mr. Pratt, Mrs. Higgins and Dimitar Dimitrov as additional defendants.

35.     Plaintiff is informed and believes, and thereon alleges, that most, if not all the litigation expenses and expert witness costs incurred in connection with the AN Litigation were paid from 3GL's revenues, without any reimbursement to 3GL by Mr. Higgins and Mrs. Higgins.  On information and belief, this includes not only the CA Action, but also the litigation expenses incurred in lawsuits in Canada and Bulgaria that named Mr. Higgins individually but did not name 3GL, Mr. Pratt or Mr. Dimitrov as defendants.

36.     In addition to consuming financial resources, the AN Litigation was a significant burden on Mr. Pratt and others at 3GL.  Mr. Higgins insisted that Mr. Pratt and others assist him in defense efforts against Advanced Nutrients, including defense of claims directed at Mr. Higgins and Mrs. Higgins individually.  At the time, Mr. Pratt believed that Mr. Higgins wanted the best for 3GL and spent long hours working closely with 3GL's attorneys and consultants in an effort to beat back the AN Litigation.

37.     For the rest of 2015, in a desperate push to get ahead of litigation expenses, Mr. Pratt continued to work tirelessly on product development, marketing and sales efforts.  He created, managed and improved the Santa Rosa facility, attended numerous trade shows out of town, worked hard to secure agreements with distributors, and visited dozens of retail stores around the country with other 3GL sales representatives in an effort to increase sales and visibility of 3GL products.

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

38.     In all of 2015, Mr. Pratt was not paid for his work for 3GL and did not get any reimbursements for the approximately $48,000 in expenses he advanced for the benefit of 3GL that year.

## C.     EHI Wrongfully Assumes Control Over 3GL's Artwork

39.     The first few months of 2016 brought promise of brighter times ahead for 3GL.  On or about January 8, 2016, Advanced Nutrients dismissed the CA Action without prejudice.  January 24, 2016 marked the day when Emerald Harvest won one of its first "Best Nutrient Award" from Dope Magazine.  In February 2016, Mr. Pratt helped secure multiple major accounts during road shows and trade shows in Florida, Seattle and Washington.

40.     However, in early March 2016, Mr. Higgins started preparing for a legal action against Chris Bullock, the artist who created the remarkably elaborate original artwork for labels and packaging used in connection with 3GL's fertilizer products.

41.     On or about April 20, 2016 EHI filed suit against Mr. Bullock in British Columbia, Canada ("Bullock Lawsuit"), alleging that Mr. Bullock failed to fully transfer the rights and control over the artwork to EHI.  Mr. Pratt was largely kept in the dark about the Bullock Lawsuit.  Plaintiff is informed and believes, and thereon alleges, that EHI's complaint against Mr. Bullock was premised on the allegation that EHI hired Mr. Bullock in February 2014 to assist in the creation of design logos, labels and other advertising and promotional materials ("the Artwork").  This allegation was demonstrably false given that EHI was not formed until December 15, 2014.

42.     Plaintiff is informed and believes, and thereon alleges, that Mr. Bullock filed a counter-suit, alleging that Mr. Higgins reneged on his promise of an ownership share in 3GL, which Mr. Bullock knew as Emerald Harvest, in consideration for the Artwork.

43.     Plaintiff is informed and believes, and thereon alleges, that the prosecution of the Bullock Lawsuit and the defense against Mr. Bullock's counter-

claims was financed entirely by 3GL, both directly and through reimbursements by 3GL to EHI and Mr. Higgins.

44.     Mr. Bullock's counter-claims highlighted an emerging pattern by Mr. Higgins of making promises of ownership shares in the business in an effort to attract key personnel and then reneging on these promises once the personnel had accomplished some or most of the key tasks they were hired to undertake.

45.     For example, on May 17, 2016, Dan Mair, the head of communications at 3GL, commented in response to hearing about Mr. Bullock's counter-claims:

> I am not sure about Chris's claim to a 5% profit share, but it would accord with the 5% profit share that you stated you intended to offer various people, including myself, during the founding days of the company. Specifically, you initially offered a profit share starting at 2% and ending in 5% after five years with the company; later, it changed to the conditions detailed below [referring to vaguely phrased letters of intent and a proposed bonus structure].

46.     Mr. Higgins kept most of the pertinent details about the Bullock Lawsuit hidden from Mr. Pratt and 3GL, aided by the fact that this action was litigated in Canada.  Mr. Pratt and 3GL trusted Mr. Higgins to handle the Bullock Lawsuit with the best interests of 3GL and its members in mind, as 3GL invested heavily in promoting the Emerald Harvest brand and the growing association of the Artwork with 3GL's products in the marketplace.

47.     Plaintiff is informed and believes, and thereon alleges, that the Bullock Lawsuit was ultimately settled in or about October 2017, with the ownership rights to the Artwork transferred to EHI, including the following:

        a.  EMERALD HARVEST Logo Design artwork;
        b.  EMERALD & VINE Design artwork;
        c.  GROW Design artwork;
        d.  MICRO Design artwork;
        e.  BLOOM Design artwork;
        f.  CALI PRO GROW A Design artwork;
        g.  CALI PRO GROW B Design artwork;
        h.  CALI PRO BLOOM A Design artwork;
        i.  CALI PRO BLOOM B Design artwork;
        j.  CALI PRO Design artwork;

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

1
2
3

          k.  EMERALD GODDESS Design artwork;
          l.  HONEY CHROME Design artwork;
          m. KING KOLA Design artwork;
          n.  ROOT WIZARD Design artwork; and
          o.  MARK'S MIX Design artwork.

4     48.     Plaintiff is informed and believes, and thereon alleges, that shortly prior

5  to settlement of the Bullock Lawsuit, Mr. Higgins executed an assignment that

6  purported to transfer his alleged individual ownership rights in the Artwork to EHI.

7     49.     Based on the fact that 3GL owned the trademark rights to marks used in

8  connection with the Artwork, 3GL was the original owner of all intellectual property

9  rights in the Artwork, and 3GL never assigned those trademark and other intellectual

10  property rights to Mr. Higgins or EHI, Mr. Higgins' purported assignment of rights and

11  settlement of the Bullock Lawsuit violated 3GL's intellectual property rights and

12  benefitted EHI and Mr. Higgins as EHI's sole shareholder to the detriment of 3GL and

13  its members.

14

15  **D.     Emerging Pattern of Abuse by Mr. Higgins Directed at Key Employees**

16     50.     In mid-2016, the illusion that Mr. Higgins was acting in the best interests

17  of 3GL developed further cracks as Mr. Higgins began to attack and abuse Mr. Mair,

18  who has been with 3GL since its inception, played a key role in successfully defending

19  against the AN Litigation, and challenged Mr. Higgins in May 2016 with respect to

20  broken promises of an ownership interest in 3GL as alleged above.

21     51.     Almost immediately upon his receipt of Mr. Mair's May 17, 2016 email,

22  Mr. Higgins started to complain about Mr. Mair's work availability.  Mr. Higgins

23  repeatedly berated Mr. Mair, who resides in Prague, Czech Republic, for failing to

24  answer Mr. Higgins' phone calls and demanded that Mr. Mair "choose to better adapt

25  to the hours I am available … which is typically 18 hours a day 7 days a week."  When

26  Mr. Mair explained that he has young children which restricts his availability, Mr.

27  Higgins demanded that Mr. Mair be more like another 3GL employee, Hollee Wark,

28

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

who also has two children, "yet its [sic] never a problem to get Hollee on a call 24/7."

"Honestly, Robert, I cannot believe how much you disrespect me," replied Mr. Mair.

52.     With this background, Mr. Pratt continued to exert maximum effort to develop the business and market 3GL's products.  On or about June 1, 2016, Mr. Pratt completed a project with Stainless Assets to custom design and build the new and much-improved twin mixing tanks, allowing the 3GL factory to produce six times more fertilizer than before.  On or about August 13, 2016, Mr. Pratt led the 3GL team to the Lift Trade Show in Vancouver, British Columbia, resulting in a successful launch of the Emerald Harvest brand in Canada.  In September 2016, Mr. Pratt secured advertising on a Discovery Channel TV show at Phat Panda in Washington State.  In October and December 2016, Mr. Pratt secured large accounts through various events and marketing trips in the United States and Puerto Rico.

53.     On or about November 19, 2016, having gone for 34 months without any pay or reimbursements for his owner contributions to 3GL, Mr. Pratt inquired with Mr. Higgins as to when the members of 3GL can start receiving pay from the company. Mr. Higgins responded by putting forth a revenue target that was never honored.

54.     Plaintiff is informed and believes, and thereon alleges, that Mr. Pratt's appropriate inquiry about compensation appears to have triggered Mr. Higgins into a retaliatory and abusive state of mind with behavior directed towards Mr. Pratt.

55.     On or about January 4, 2017, Mr. Higgins chided and berated Mr. Pratt in an email that falsely accused him of "mismanagement of corporate funds" and violations of 3GL's "accounting processes."  Mr. Higgins effectively blamed 3GL's financial challenges on Mr. Pratt and the sales team, threatening to cut off Mr. Pratt's ability to use 3GL's funds to do business and "gravely impact the partnership."

56.     These baseless accusations and the ensuing vitriolic conversations with Mr. Higgins were profoundly unsettling and destabilizing to Mr. Pratt.

57.     On or about February 17, 2017, Mr. Pratt received the first check from 3GL in the amount of $2,500 toward repaying his owner contributions to 3GL, which

1   at that time added up to approximately $675,000.  He still, however, received no pay or

2   profit distributions for his round-the-clock work for 3GL.

3

4   **E.   Self-Dealing by Mr. Higgins in 2017 and 2018**

5   58.    Plaintiff is informed and believes, and thereon alleges, that on or about

6   January 1, 2017, Mr. Higgins formed defendant 3GI (3G Green Garden Group, Inc.), a

7   Canadian corporation located in British Columbia.  On the same day, Big Bear Salmon

8   Charters Ltd., another Canadian business entity owned by Mr. Higgins, was merged

9   with 3GI.  Mr. Higgins listed himself as the sole Director of 3GI.  Mr. Higgins did not

10  inform or consult with Mr. Pratt about the formation of 3GI, the merger of Big Bear

11  Salmon Charters Ltd., or the purposes behind this business, which mirrored the name

12  of 3GL.

13  59.    In August 2017, Mr. Higgins engaged his brother-in-law, Phil

14  LaRochelle, and his company HydroBleum, Inc., to be the exclusive distributor of

15  3GL's products in Quebec, Canada.  This action was done without proper notice or a

16  vote by the members of 3GL.  Plaintiff is informed and believes, and thereon alleges,

17  that Mr. LaRochelle was not knowledgeable in the science and marketing of plant

18  fertilizers.

19  60.    On or about September 22, 2017, 3GL sent a large order ($139,439) of

20  fertilizer to Mr. LaRochelle in Canada.  Plaintiff is informed and believes, and thereon

21  alleges, that over time, this order proved to be a total loss for 3GL as none of the

22  merchandise was paid for, sold or returned to 3GL by Mr. LaRochelle and

23  HydroBleum, Inc.  Plaintiff is informed and believes, and thereon alleges, that Mr.

24  LaRochelle sold 3GL's merchandise for cash and pocketed the proceeds together with

25  Mr. Higgins.

26  61.    Another egregious example of Mr. Higgins' mis-use of 3GL's resources

27  for his personal benefit involves his pursuit of Stephen Dattels.  Plaintiff is informed

28  and believes, and thereon alleges, that Mr. Dattels is a wealthy mining executive and

resource financier, whose name Mr. Higgins first mentioned to Mr. Pratt in March 2017, as someone who is "[l]ooking to get heavily involved in the industry."

62.     Plaintiff is informed and believes, and thereon alleges, that Mr. Higgins believed at the time that by ingratiating himself with Mr. Dattels and lavishing him with free assistance and attention, Mr. Dattels would help Mr. Higgins take the Emerald Harvest brand public and make Mr. Higgins and Mrs. Higgins potentially hundreds of millions of dollars, or in Mr. Higgins' own words, "fabulously wealthy." Instead of recognizing that Emerald Harvest brand was not ready to go public and focusing on developing the 3GL business and production operations, Mr. Higgins ignored 3GL's business needs to chase after personal riches.

63.     For example, in his pursuit of Mr. Dattels, Mr. Higgins required that in November 2017, Mr. Pratt and two consultants paid by 3GL travel to Uruguay to advise on an investment contemplated by Mr. Dattels.  This trip was followed by the entire 3GL team working for weeks to build out an investor deck and presentation for Mr. Dattels' investments in Uruguay and elsewhere.  Plaintiff is informed and believes, and thereon alleges, that 3GL received no renumeration or other tangible benefit for this work.

64.     Mr. Higgins' pursuit of Mr. Dattels continued with a December 2017 trip to Israel by Mr. Pratt, Noah Hirsch and another member of 3GL's consulting team. This trip took place the week before Christmas and on two days' notice by Mr. Higgins who demanded that Mr. Dattels be lavished with constant attention and maximum effort. This trip to Israel required a significant amount of capital expenditures and personnel work that 3GL could ill-afford.  Plaintiff is informed and believes, and thereon alleges, that 3GL received no renumeration or other tangible benefit for this work.

65.     In April 2018, Mr. Higgins again made demands that 3GL serve Mr. Dattels free of charge and required Mr. Pratt and Mr. Hirsch to travel to Malta on two days' notice to assess potential investments for Mr. Dattels.   This trip was micro-

managed by Mr. Higgins, who was abusive and demanding at all hours of the day.  In one example, Mr. Higgins berated Mr. Pratt and Mr. Hirsch for going "out to dinner" instead of focusing on work 24 hours a day as Mr. Higgins claims he and Mr. Dattels do.  Plaintiff is informed and believes, and thereon alleges, that 3GL received no renumeration or other tangible benefit for this work.

66.     Plaintiff is informed and believes, and thereon alleges, that year 2018 started with a major downward trend and market correction, with the hydroponic industry contracting 43% and, despite 3GL's growth as a young company, this period was very difficult and taxing on 3GL and its staff.

67.     In the midst of this downturn and through the middle of 2018, Mr. Higgins continued dedicating vast amounts of 3GL management team's time and financial resources working on various projects for Mr. Dattels, at least in some of which Mr. Higgins had a beneficial interest.  For example, in January 2018, 3GL built out a presentation for a venture called NettaGro in Uruguay involving Mr. Higgins and Mr. Dattels.  In June 2018, Mr. Higgins demanded that 3GL build out a marketing presentation for another of Mr. Dattels' investments, Georgian Bay Biomed.  Plaintiff is informed and believes, and thereon alleges, that 3GL received no renumeration or other tangible benefit for any of this work.

68.     Plaintiff is informed and believes, and thereon alleges, that Mr. Higgins has derived personal benefit and enrichment from Mr. Dattels, his affiliated entities and/or associates in consideration of free-of-charge consulting work provided by 3GL.

F.     **Mr. Higgins Lashes Out Against Mr. Pratt and Other Team Members**

69.     Mr. Higgins' pursuit of Mr. Dattels caused significant damage to 3GL's business and made it much more difficult to prepare for and weather the major downturn in the hydroponics industry.  It also made it more difficult for 3GL to pay vendors and repay the debts that were incurred in connection with the AN Litigation.

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

1  Mr. Higgins' self-evident failure to take care of 3GL's needs caused discord between

2  Mr. Higgins and most of 3GL's management team.

3      70.    In November 2017, Mr. Higgins belittled and berated Mr. Mair, Head of

4  Communications for 3GL, for failing to work the weekend on an investment deck for

5  Mr. Dattels' project, declaring in an email that "I-am [sic] a fighter and will get it

6  done," adding that "[t]his opportunity is worth more than EH ever will be… [.]"

7      71.    On or about April 28, 2018, Philip Gonzales joined 3GL as a full-time

8  Vice President of Marketing.  Mr. Gonzales was highly qualified for this position and

9  his joining the team was exciting news at 3GL.

10     72.    On or about May 5, 2018, Mr. Higgins emailed Mr. Pratt to accuse him of

11  making excuses for the financial challenges of 3GL, "lack of proper commitment and

12  selling motivation," "[l]ack of showing up," and offering over 40 motivational quotes.

13     73.    On or about May 25, 2018, Mr. Higgins continued badgering Mr. Mair,

14  this time with a small novel of an email, justifying his abusive behavior towards Mr.

15  Mair and Mr. Pratt, and bemoaning his "massive responsibility for the funding and

16  profitability of this company."  Plaintiff is informed and believes, and thereon alleges,

17  that after Mr. Gonzales decided to terminate an underperforming employee who

18  happened to be a favorite of Mr. Higgins, Mr. Gonzales was retaliated against by Mr.

19  Higgins and forced to quit after just one month on the job.  Upon Mr. Gonzales'

20  departure from 3GL's employment, Mr. Mair became an independent contractor for

21  3GL working part-time.

22     74.    In or about June 2018, seeing the contraction in the hydroponics market

23  and waning hopes for an IPO, Mr. Higgins started to insist that 3GL present unrealistic

24  figures and projections in its pitches to prospective investors.  Mr. Higgins would not

25  listen to the feedback of 3GL's management team and kept insisting on using numbers

26  that professionals did not feel comfortable with.  Unwilling to compromise his ethics

27  and integrity, 3GL's Chief Financial Officer Richard Wong left the company.  Plaintiff

28  is informed and believes, and thereon alleges, that 3GL owed Mr. Wong approximately

$170,000 for his work and advances to the business, which never was paid to Mr.

Wong.

75.     On or about June 9, 2018, Mr. Higgins emailed another 5-page missive to Mr. Pratt, this time pretending Mr. Pratt was nothing more than a Sales Manager at 3GL and berating him for "lack lustre [sic] focus of the sales team and lack of accountability."  In the same communication, Mr. Higgins falsely asserted that he alone designed the Emerald Harvest brand and that his "single biggest challenge at the company" was dealing with Mr. Pratt's underperformance and "negligence."

76.     The reality was that by mid-2018, Mr. Higgins had depleted 3GL's resources by chasing after Mr. Dattels, the hydroponics market was in a free-fall resulting in dramatically reduced demand for plant fertilizers, and the shrinking sales would not back up the manufactured financials and overblown projections that Mr. Higgins was peddling in an effort to sell the business or take it public.

77.     Mr. Higgins' abuse and scapegoating of Mr. Pratt dramatically escalated in July 2018.  On or about July 9, 2018, Mr. Pratt laid to rest the ashes of his mother and father in a family ceremony on Long Island Sound in Connecticut.  The fact that Mr. Pratt was attending services and grieving with family did not deter Mr. Higgins from demanding that Mr. Pratt drop what he was doing and work on a sales opportunity.  Mr. Pratt obliged Mr. Higgins and received rare praise in return.

78.     On or about July 12, 2018, Mr. Pratt realized that he needed to protect his mental health and took a sabbatical to properly grieve the loss of his parents and get away from being routinely undermined and abused by Mr. Higgins.

79.     Mr. Pratt returned to work at 3GL in October 2018.

80.     Unfortunately, Mr. Higgins' abuse of Mr. Pratt escalated again in early 2019.  In 2018, Mr. Higgins authorized an advertisement of Emerald Harvest brand in Soft Secrets, a magazine and website focused on the Spanish-speaking hydroponics industry, with generous product credits offered in the promotion.  This marketing campaign also involved printed ads in partnership with 3GL's Spanish distributor,

Hortitec.  However, when the cost of this promotion became clear, Mr. Higgins blamed
Mr. Pratt for this marketing decision and pummeled him with abusive and demeaning
emails.  Mrs. Higgins also piled on and berated Mr. Pratt for the business decision
made by her husband.

81.     In the ensuing back-and-forth, Mr. Higgins repeatedly authorized Mr.
Pratt to audio record their phone calls, and banned Mr. Pratt from any contact with
Hortitec.  Mr. Higgins also offered to buy out Mr. Pratt's ownership share in 3GL for
$1,000,000, plus repayment of all owner contributions made by Mr. Pratt to-date.

82.     On or about January 31, 2019, convinced that he was being pushed out
of 3GL and blamed for most of its challenges, Mr. Pratt offered to accept the buyout
provided that Mr. Higgins provide him with appropriate accounting that supported the
valuation of his ownership interest and owner contributions.  Said accounting was not
provided, and Mr. Higgins continued to keep Mr. Pratt in the dark about most of the
financial transactions of the business.

83.     Without a resolution on the buyout, Mr. Pratt continued developing
3GL's business and doing his best to please the volatile Mr. Higgins.  Unfortunately,
just about every effort backfired and attracted Mr. Higgins' wrath.

84.     Plaintiff is informed and believes, and thereon alleges, that Mr. Higgins'
email communications that deliberately and intentionally misconstrued facts were
aimed at laying the groundwork for future legal action against Mr. Pratt.

85.     By mid-2019, with 3GL's sales steadily on the rise, 3GL leased 3,300
square feet of warehouse space near its main facility in Santa Rosa.

86.     Despite Mr. Pratt's continuing and successful efforts at 3GL throughout
2019, Plaintiff is informed and believes, and thereon alleges, that Mr. Higgins was set
on emotionally destabilizing Mr. Pratt and pushing him out of 3GL and the Emerald
Harvest business.

87.     On or about June 13, 2019, Mr. Higgins issued a directive that he be
copied "on all correspondence related to 3G Green Garden Group dba Emerald

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

Harvest," including "all internal and external correspondence with any staff, contractors, clients, potential clients, distributors, suppliers, potential suppliers, attorney's, or anyone for any reason on company matters."

88.     In or about September 2019, over four (4) years after he began working for 3GL, Mr. Pratt was finally added to 3GL's payroll, earning an annual salary of $120,000, which was then reflected in a W-2 form issued by 3GL to Mr. Pratt. As of that time, despite being a 25% member of 3GL, Mr. Pratt had no knowledge or information on whether Mr. Higgins and Mrs. Higgins drew a salary or profit distributions from 3GL.

89.     Mr. Pratt received no profit distributions from 3GL in 2019, or any other year.

90.     Year 2019 ended with another confrontation, this time related to Mr. Pratt expressing concerns about Mr. Higgins' and Mrs. Higgins' decision to forego and/or reduce Christmas bonuses to 3GL's staff.

91.     On or about December 19, 2019, Mr. Pratt emailed Mr. Higgins and Mrs. Higgins to share his observations of staff going above and beyond in their work for 3GL and advocate for modest bonuses to them. Mr. Pratt even offered "to pay out of my own pocket and it can go against my owner contributions if you don't agree."

92.     Mr. Higgins flatly refused this request, misrepresenting that "[e]ach person on the team gets paid well and their wage is in alignment with or above labor standards," adding that the proposed bonuses were "not an easy amount to pay out at the moment," and concluding that "[y]ou are not authorized to operate outside the companies [sic] financial means."

**G.     Suspicions Grow Over Self-Dealing and Mis-Management by the Higgins**

93.     With 3GL sales on the rise, on or about January 3, 2020, 3GL executed a lease on a 25,000 square foot distribution facility at 975 Corporate Center Parkway in Santa Rosa, California.

94.    In negotiating this new lease, Mr. Higgins absolutely refused to share any financials with the landlord.  This resulted in worse lease terms than otherwise offered and caused and continues to cause damage to 3GL.

95.    Mr. Higgins' unexplained refusal to share financials was a red flag to Mr. Pratt, who was not involved in bookkeeping and financial management of 3GL since the inception of the business, trusting that Mr. Higgins and Mrs. Higgins would abide by their duties to 3GL and its members to appropriately manage company's funds and keep accurate and complete accounting and records.

96.    On or about February 2, 2020, Mr. Pratt discovered two checks for $425,000 and $350,000 that were written on or about January 27, 2020, from 3GL's account to EHI.  Mr. Pratt immediately contacted Mr. Higgins and Mrs. Higgins to inquire about the business reasons behind these transfers.  Mr. Higgins responded that "[f]unds are allocated for accounting needs.. of which you do not deal with," adding that "banking information … should not be accessed," and "banking access limitations will be put in place shortly."

97.    Following the advent of COVID in March 2020, Emerald Harvest released custom-bottled hand sanitizer as a free marketing gift.  After initial positive feedback, and against the advice of 3GL's employees, Mr. Higgins exhibited his profligate spending habits by purchasing hundreds of gallons of sanitizer at inflated prices, with 150,000 bottles of surplus sanitizer still sitting in 3GL's warehouse.

98.    On or about April 7, 2020, Mrs. Higgins informed one of 3GL's largest distributors, Hawthorne USA, that all future payments for 3GL's fertilizer products purchased in Canada must now be wire-transferred to EHI's bank account at the Royal Bank of Canada.  When Mr. Pratt inquired about payment procedures for other international distributors of 3GL's products, Mrs. Higgins responded that "[t]he international distributors are billed through Emerald Harvest Canada not Emerald Harvest US."  She instructed Mr. Pratt to provide new wiring instructions to all

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

1  international distributors and have them pay for 3GL's products by wiring funds to

2  EHI's Royal Bank of Canada account, to which Mr. Pratt had no access.

3       99.    Mr. Pratt did not understand the business reasons behind this directive.

4  All fertilizer products sold in the United States and internationally were manufactured

5  by 3GL in its Santa Rosa facility and shipped from there.  3GL purchased most of the

6  component materials for the fertilizer products in the United States.  3GL also paid for

7  all the bottles and labels used in packaging of 3GL's products.  The Canadian side of

8  Emerald Harvest business was limited to a small administrative office in British

9  Columbia where Mr. Higgins, Mrs. Higgins and several support staff worked.

10       100.    Unfortunately, spring of 2020 brought about the onset of the COVID

11  pandemic.  All trade shows and overseas trips were cancelled.  Training, marketing and

12  sales were limited to video conferencing, emails and phone calls.  Unable to go into the

13  field, Mr. Pratt focused his efforts on testing new product lines, managing frequent

14  shipping issues, and keeping up product sales and relations with foreign distributors,

15  commercial clients and prospects, as well as motivating and guiding the 3GL sales

16  team members, in an effort to keep 3GL afloat in a new and unpredictable business

17  environment.

18       101.    Throughout this challenging time, Mr. Pratt trusted that Mr. Higgins and

19  Mrs. Higgins continued to have the best interests of 3GL and its members in mind.

20  Unbeknown to Mr. Pratt at the time, Plaintiff is now informed, and thereon alleges, that

21  in the spring of 2020 Mr. Higgins and Mrs. Higgins were instead focused on

22  misappropriating 3GL's intellectual property and syphoning millions of dollars out of

23  3GL to finance the construction of their newly constructed, ostentatious, approximately

24  $15,000,000 mansion in British Columbia, Canada.

25       102.    On or about April 29, 2020, Mr. Higgins applied for registration of the

26  TRUCROP trademark, with the payment for this service charged to 3GL's debit card.

27  While Mr. Pratt was informed and believed that the TRUCROP mark would be

28  registered for the benefit of 3GL, he learned after being copied on an email from the

trademark attorney that this application was made in the name of TruCrop Plant Nutrients, Inc., a Canadian corporation in Chilliwack, British Columbia.  As Mr. Pratt discovered later, Mr. Higgins incorporated TruCrop Plant Nutrients, Inc., in Canada in November 19, 2019, listing himself as its sole Director.

103.    By early October 2020, 3GL completed the testing and labels for another new product, HYDRA CLEAR, a powerful biotic multi-enzyme solution designed to remove buildup in feeding lines in hydroponic systems.  While Mr. Pratt expected this product to be registered in the name of 3GL, he later discovered that no application for the HYDRA CLEAR mark was ever submitted to the USPTO.  Plaintiff is informed and believes, and thereon alleges, that Mr. Higgins intentionally failed to register this mark in the United States to make it easier for him to claim that the intellectual property rights to this product belonged to EHI, 3GI and/or to Mr. Higgins individually.

104.    In or about late 2020, 3GL worked to develop the EMERALD EDGE brand of commercial hydroponic nutrient products.  The trademark application for EMERALD EDGE was submitted in the name of 3GL in 2017.  On or about January 12, 2021, 3GL's Controller, Francesca Shannahan, requested Mr. Pratt to register a new DBA for EMERALD EDGE in Sonoma County, California, under the 3GL's business name.  Mr. Pratt began the registration process, however, on or about June 7, 2021, Mrs. Higgins refused to approve the publication of the Fictitious Business Name Statement which would finalize the DBA registration, stating "[t]his ad will not be printed, this was set up incorrectly."  As Mr. Pratt discovered later, 3GL's trademark application with the USPTO was deemed abandoned on or about May 3, 2021, because no Statement of Use or Extension Request was timely filed.  Plaintiff is informed and believes, and thereon alleges, that despite all the resources invested by 3GL into the development of the EMERALD EDGE brand, Mr. Higgins and Mrs. Higgins "killed" the EMERALD EDGE brand because it was not set up to be owned by EHI or 3GI.

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

105.    Plaintiff is informed and believes, and thereon alleges, that Mr. Higgins and Mrs. Higgins effectuated their effort to misappropriate the next line of 3GL's products by using the EMERALD EDGE concept with a new mark, NEXGEN.  A tremendous amount of 3GL's resources were poured into development and branding of the NEXGEN family of fertilizer products.  However, the mark that Mr. Higgins authorized 3GL's trademark attorney to register in the name of 3GL was N NEXGN, and not NEXGEN.  In conversations between Mr. Pratt and Mr. Higgins that took place in April 2021, Mr. Higgins expressly stated that he owned all the brands of 3GL, including NEXGEN, despite all appearances.

**H.    Mr. Pratt's Pay Is Converted to "Guaranteed Payment to Partner"**

106.    On or about April 7, 2021, 3GL hired Valerie Papp as Head of Human Resources based in British Columbia, Canada.  Many at 3GL hoped that Ms. Papp would help guard against some of the worst abuses by Mr. Higgins.  In or about April 2021, Ms. Papp interviewed each 3GL employee "to understand how employees perceive the company, the company culture, and their work environment."

107.    On or about May 17, 2021, Mrs. Higgins announced that "[t]he 2020 W-2 slip issued to David Pratt will be cancelled," and 3GL issued a 2020 Form 1065 K-1 Statement to Mr. Pratt that listed the salary he received that year as "Guaranteed Payments to Partners."  There were no other changes implemented at that time in the scope and manner of Mr. Pratt's work at 3GL.

108.    The 2020 Form 1065 K-1 contained another troubling revelation, as it showed Mr. Pratt's 25% share of the LLC's recourse liabilities at the end of year 2020 as $1,435,360.  This meant that the LLC's total recourse liabilities by the end of year 2020 were $5,741,440.  Mr. Pratt understood the very purpose behind 3GL's business form as a limited liability company was to protect its members from personal liability for the debts and obligations of the business.  Mr. Pratt has no knowledge of personally

1  guaranteeing any debts of 3GL, and he was never informed that such personal

2  guarantees were given by Mr. Higgins and/or Mrs. Higgins.

3      109.   Plaintiff is informed and believes, and thereon alleges, that Mr. Higgins

4  and Mrs. Higgins burdened 3GL and Mr. Pratt as its member with financial liabilities

5  incurred primarily through Mr. Higgins' and Mrs. Higgins' self-dealing and fraud.

6

7  **I.    Emotional Distress Lands Mr. Pratt in a Hospital**

8      110.   In or about June 2021, Wells Fargo bank informed 3GL that it closed its

9  operating account and notified 3GL that the account would become inactive on July

10 12, 2020.  Plaintiff is informed and believes, and thereon alleges, that Wells Fargo's

11 decision was triggered by Mr. Higgins' and Mrs. Higgins' misuse of the account and

12 their repeated insistence that the large amounts of cash they agreed to accept as

13 payments for fertilizer products be deposited into the bank.

14      111.   Since Mr. Pratt was the only member of 3GL with United States

15 citizenship, he viewed it as his obligation to find another bank that would be willing to

16 work with 3GL.  On or about June 19, 2021, after approximately nine (9) banks said

17 'no', Mr. Pratt called Mr. Higgins to ask for help.  True to form, Mr. Higgins blamed

18 Wells Fargo's decision entirely on Mr. Pratt, claiming that banks were unwilling to

19 work with 3GL because Mr. Pratt was too "sketchy" and the government must have

20 been onto him.  After Mr. Higgins' accusations became increasingly nonsensical,

21 intense, and personal, Mr. Pratt hung up the phone.

22      112.   Later in the day, Mrs. Higgins contacted Mr. Pratt and attacked him over

23 being "vile" in his conversation with Mr. Higgins.  In effect, it appeared that Mrs.

24 Higgins believed that all the abuse heaped by Mr. Higgins on Mr. Pratt during their

25 phone call was actually said by Mr. Pratt to Mr. Higgins.

26      113.   Plaintiff is informed and believes, and thereon alleges, that on or about

27 June 19, 2021, the cognitive dissonance of these abusive encounters with Mr. Higgins

28 and Mrs. Higgins sent Mr. Pratt into an anxiety loop and resulted in skyrocketing blood

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

pressure and a severe panic attack.  The left side of Mr. Pratt's body started going numb and he immediately checked himself into a hospital.  Stroke was suspected and the hospital ran many tests to determine what happened.

114.    As it turned out, Mr. Pratt was so hypertensive that his brain was malfunctioning.  He was diagnosed with Hypertensive Encephalopathy and immediately began medical leave from 3GL.  Based on doctor's instructions, Mr. Pratt's leave was to be for at least through September 22, 2021.  Mr. Pratt's bi-weekly pay from 3GL was stopped for the duration of his medical leave.

115.    On or about July 2, 2021, while still on leave, Mr. Pratt was nevertheless able to secure a new bank account with Bank of America and saved 3GL from the precipice of not having a banking relationship needed to continue doing business.

116.    On or about July 22, 2021, Mr. Higgins emailed Mr. Pratt to inform him in writing that he was demoted and was no longer the President of 3GL because "you have been failing in the capacity of President for some time and that we are making a change in your job title to reflect the work you have been doing[.]"  No formal action or a vote by the members of 3GL was taken in connection with this demotion.

117.    Upon Mr. Pratt's demotion, which violated the terms of the Agreement between Mr. Pratt and Mr. Higgins at the time 3GL was formed, Mr. Higgins unilaterally appointed Mrs. Higgins as the President of 3GL.  No formal action or a vote by the members of 3GL was taken in connection with this appointment.

**J.    Mr. Pratt Discovers Overwhelming Evidence of Fraud and Self-Dealing**

118.    While on medical leave in mid-2021, Mr. Pratt reflected on the fact that after seven (7) years of working around the clock on 3GL's business, he only occasionally received "guaranteed pay" and received no profit distributions, while according to Mr. Higgins and Mrs. Higgins, 3GL was almost constantly in financial distress despite producing and selling tens of millions of dollars' worth of fertilizer products.

119.   Mr. Pratt obtained copies of 3GL's Wells Fargo bank account statements and discovered that since 2015, millions of dollars have been siphoned by Mr. Higgins and Mrs. Higgins to EHI, 3GI, Mr. Higgins and Mrs. Higgins individually, and to dozens of third parties for the personal benefit of Mr. Higgins and Mrs. Higgins.

120.   Mr. Pratt's inquiry into 3GL's finances continued into year 2022, with his review of 3GL's Bank of America account statements.  The results of Mr. Pratt's findings are summarized below.

121.   **Transfers from 3GL to EHI**.  Based on Mr. Pratt's review of 3GL's bank statements for the period from 2015 to April 2022, the following chart reflects the transfers by Mr. Higgins and Mrs. Higgins from 3GL to EHI during that time period:

| Dates of Transfers | Amount Transferred (at least) |
| --- | --- |
| Jul. 27, 2015 to Dec. 23, 2015 | $46,600 |
| Year 2016 | $222,000 |
| Year 2017 | $477,800 |
| Year 2018 | $305,600 |
| Year 2019 | $362,000 |
| Year 2020 | $1,719,000 |
| Year 2021 | $1,678,000 |
| Feb. 8, 2022 to Apr. 5, 2022 | $200,000 |
| **Total Transfers:** | **$5,011,000** |

122.   **Transfers from 3GL to 3GI**.  Based on Mr. Pratt's review of 3GL's bank statements for the period from 2015 to March 2022, the following chart reflects the transfers by Mr. Higgins and Mrs. Higgins from 3GL to 3GI during that time period:

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

| Dates of Transfers | Amount Transferred (at least) |
|---|---|
| July 1, 2015 to Dec. 23, 2015 | $69,380 |
| Year 2016 | $149,100 |
| Year 2017 | $233,100 |
| Year 2018 | $163,129 |
| Year 2019 | $318,000 |
| Year 2020 | $1,200,000 |
| Year 2021 | $643,000 |
| Feb. 8, 2022 to Mar. 29, 2022 | $126,000 |
| **Total Transfers:** | **$2,901,709** |

123. **Transfers from 3GL to Mr. Higgins**.  Based on Mr. Pratt's review of 3GL's bank statements for the period from 2015 to December 2021, the following chart reflects the transfers by Mr. Higgins and Mrs. Higgins from 3GL to Mr. Higgins individually during that time period:

| Dates of Transfers | Amount Transferred (at least) |
|---|---|
| Aug. 24, 2015 to Dec. 30, 2015 | $275,700 |
| Year 2016 | $560,000 |
| Year 2017 | $1,060,670 |
| Year 2018 | $837,955 |
| Year 2019 | $1,232,937 |
| Year 2020 | $1,147,000 |
| Year 2021 | $1,642,000 |
| **Total Transfers:** | **$6,756,263** |

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

124.   **Transfers from 3GL to Mrs. Higgins**.  Based on Mr. Pratt's review of 3GL's bank statements for the period from 2015 to December 2021, the following chart reflects the transfers by Mr. Higgins and Mrs. Higgins from 3GL to Mrs. Higgins individually during that time period:

| Dates of Transfers | Amount Transferred (at least) |
|---|---|
| Year 2017 | $62,000 |
| Year 2018 | $25,500 |
| Year 2019 | $49,500 |
| **Total Transfers:** | **$137,000** |

125.   **Transfers from 3GL for Mr. and Mrs. Higgins' Personal Benefit**.  In addition to the above, Mr. Pratt has discovered many other transfers from 3GL to third parties that appear to have been made for the personal benefit of Mr. Higgins and Mrs. Higgins, and for no apparent benefit to 3GL, including but not limited to the following:

| Year | Recipient | Amount | Details (pleaded on information and belief) |
|---|---|---|---|
| 2015 | Bull Housser | $25,000 | This law firm represented Mr. Higgins individually in Canada in the AN Litigation |
| 2016 | Andrey Delchev & Partners | $4,394 | Mr. Delchev was Mr. Higgins' attorney in Bulgaria who represented him individually in the AN Litigation |
| 2016 | Bartko Zankel Bunzel | $11,593.36 | Unknown legal expense |
| 2018 | Graham Thompson | $100,000 | Law firm based in the Bahamas; Mr. Higgins has property and assets in Turks & Caicos |
| 2018 | Guillermo Delmonte | $10,000 | Mr. Delmonte is the COO of Ramm Pharma Corporation, a cannabis producer |

| 2019 | Fasken Martineau | $9,265 | Unknown legal expense |
|---|---|---|---|
| 2019 | Bado, Kuster, Zerbino & Rachetti | $5,472 | Attorneys in Uruguay, apparently hired in connection with Mr. Higgins' pursuit of Mr. Dattels |
| 2020 | Twa, Marcelin, Wolf | $220,000 | Law firm based in Turks & Caicos, where Mr. Higgins has property and assets |
| 2020 | Connected Spaces | $100,000 | Home Automation company, apparently paid for work on Mr. Higgins' and Mrs. Higgins' new mansion in British Columbia |
| 2020 | Air & Sea Agency | $24,247 | Directory of Tourism for Turks & Caicos, where Mr. Higgins has property and assets |
| 2020 | Purity Designs | $188,549 | Residential design, apparently used in connection with Mr. Higgins' or his daughter's residence |
| 2020 | Saxton 4x4 | $39,070 | United Kingdom's purveyor of exotic four wheel drive vehicles |
| 2020 | The Palms Resort | $123,457 | Resort in Turks & Caicos, where Mr. Higgins has property and assets |
| 2020 | Rollins Machinery | $44,889 | Machinery and equipment provider in British Columbia |
| 2020 | Pent Sp. Zo. O. | $30,806 | Unrecognized business, possibly in Spain |
| 2020-2021 | Equity LTD | $163,838 | Financial services provider in Turks & Caicos, where Mr. Higgins has property and assets |
| 2021 | Logberg Corporate Services LTD | $1,650 | Construction services company in Turks & Caicos, where Mr. Higgins has property and assets |
| 2021 | Colorado Custom | $13,540 | Company that sells custom wheels for vehicles |

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

| 2022 | Kiva Construction | $7,830 | Construction business in Colorado Springs, Colorado |
|------|-------------------|--------|-----------------------------------------------------|

**Total amount of transfers listed in this chart: $1,123,600.36**

126.    Based on the above, it became shockingly clear to Mr. Pratt that Mr. Higgins and Mrs. Higgins were deliberately and continuously siphoning funds and intellectual property and business opportunities away from 3GL and otherwise treating 3GL as their personal piggy-bank.  3GL would incur all or most of the expenses for developing, trademarking, sourcing, manufacturing, bottling, shipping and marketing the fertilizer products, while much of the revenue generated by this work would land in the Canadian and other foreign bank accounts controlled by Mr. Higgins and Mrs. Higgins.  Mr. Pratt was never provided with a comprehensive accounting of 3GL's income and expenses, he did not have any access to or visibility into 3GI's or EHI's accounts or the overseas bank accounts controlled by Mr. Higgins and Mrs. Higgins, and he was directly instructed by Mr. Higgins to "not deal with" 3GL's accounting and not access its "banking information."

127.    In his review of 3GL's bank statements, Mr. Pratt learned that a number of transfers summarized above were made by Mr. Higgins and/or Mrs. Higgins issuing checks from 3GL's account and applying Mr. Pratt's signature stamp onto those checks without Mr. Pratt's review or approval.  Mr. Pratt was not notified by Mr. Higgins or Mrs. Higgins of the transactions and business purposes behind the transfers that involved the use of his signature stamp.

128.    Plaintiff is informed and believes, and thereon alleges, that the purpose behind the financial and intellectual property transfers summarized above was to diminish the value of 3GL and Mr. Pratt's 25% ownership interest in 3GL, avoid paying profit distributions to Mr. Pratt, and to unlawfully enrich Mr. Higgins, Mrs. Higgins, EHI and 3GI.

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

129.   On or about September 11, 2021, while still on medical leave, Mr. Pratt had a long phone call with Mr. Higgins to share some of his concerns about Mr. Higgins' and Mrs. Higgins' apparent self-dealing and mismanagement of 3GL.  In this conversation, Mr. Higgins heaped abuse on Mr. Pratt and repeatedly asserted that Mr. Pratt had no ownership of the Emerald Harvest brand and no business inquiring about the handling of financial and intellectual property assets of Emerald Harvest.  This conversation strongly reinforced Mr. Pratt's conclusion that Defendants were intentionally and unlawfully acting to the detriment of 3GL and Mr. Pratt.

**K.    Mr. Pratt Returns to Work and Is Retaliated Against by Mr. Higgins**

130.   On or about October 18, 2021, Mr. Pratt returned to work at 3GL and resumed receiving his pay of $4,615.12 twice a month.  As of this return date, Mr. Pratt was still owed over $50,000 in owner contributions he made to 3GL over the years.

131.   On or about October 27, 2021, Mr. Higgins emailed Mr. Pratt to berate him for his use of the President title in his email signature block, writing that "[t]he title of President changed months ago," Mrs. Higgins was "appointed President of Emerald Harvest," and as for Mr. Pratt's new title, "Sales Executive was proposed and officially approved."  No formal action or a vote by the members of 3GL was taken in connection with this change to Mr. Pratt's job title.

132.   The year 2022 began with a sharp downturn in the hydroponics industry, exacerbating 3GL's cashflow difficulties and sending Mr. Higgins on another round of tirades directed at Mr. Pratt.

133.   For example, Plaintiff is informed and believes, and thereon alleges, that when Mr. Higgins was eager to get orders from 3GL's distributors in New Zealand and Australia, he extended terms for these distributors to pay within 60 days from delivery instead of shipping, as shipping times have grown longer and more unpredictable during the Covid pandemic.  However, with the pressures exerted by the industry downturn and his own wrongdoing, Mr. Higgins grew less generous and backpedaled

on these terms while trying to shift the blame for this change on Mr. Pratt: "Please ensure your correspondence with clients and colleagues is fact based and not left open to erroneous interpretation."

134.   In or about January 2022, Mr. Pratt's daughter applied for financial aid and her school asked for "IRS Form 1065," which is used to declare profits, losses, deductions and credits of a limited liability company for tax filing purposes.  Mr. Pratt requested this form from Mrs. Higgins and the Controller, Francesca Shannahan, but they repeatedly sent Mr. Pratt the "IRS Form K-1 1065," which only reflected financial information as it pertained to Mr. Pratt and not 3GL as a whole.

135.   On or about February 11, 2022, after being pressed by Mr. Pratt and his spouse to provide the "IRS Form 1065" for 3GL, Mrs. Higgins finally provided the requested form to Mr. Pratt.

136.   Plaintiff is informed and believes, and thereon alleges, that within hours after the requested IRS Form 1065 was provided to Mr. Pratt, Ms. Shannahan had quit her employment, presumably in protest over the contents of that tax form.

137.   The quitting of the company's Controller was a massive red flag for Mr. Pratt as it confirmed his worst fears over the financial fraud and self-dealing undertaken by Mr. Higgins and Mrs. Higgins.

138.   On or about March 3, 2022, Mr. Pratt emailed Mr. Higgins and Mrs. Higgins to demand that they immediately stop using his signature without his prior written approval.  Mr. Higgins responded with displeasure that Mr. Pratt's request was in a written form ("[a] simple call to Sharon or myself would have ensured your signature was promptly removed"), and claiming that the use of Mr. Pratt's "electronic signature" was set up "to ensure timely payments to every US vendor, service providers and employee."  To be sure, Mr. Higgins' email made no mention of Mr. Pratt's lack of consent to use his signature stamp for millions of dollars in transfers to EHI, 3GI, Mr. Higgins and Mrs. Higgins individually, and numerous third parties for purposes unrelated to 3GL's business.

139.    Immediately upon Mr. Pratt's request to cease and desist from the unauthorized use of his signature, Mr. Higgins and Mrs. Higgins stopped issuing bi-monthly pay to Mr. Pratt.

140.    Despite the lack of pay, in or about March 2022, Mr. Pratt travelled to the United Kingdom and Spain to promote 3GL's fertilizer products.  During this trip, Mr. Pratt emailed his extensive field notes to Mr. Higgins, including detailed descriptions of every vendor he and 3GL's sales team met with, their feedback on 3GL's products, sales potential, local market conditions, marketing ideas and alike.  In his dismissive response, Mr. Higgins' described these extensive and valuable comments as "[l]ots of information," but berated Mr. Pratt for not providing "actual sales in dollars" for every vendor visited.  This was despite the fact that sales reports were provided weekly to Mr. Higgins by other sales people at 3GL, and Mr. Pratt's role was to serve as the owner-face of the company, make inroads with new and existing vendors, and tell the Emerald Harvest story, but not to generate weekly sales reports.

141.    On or about March 12, 2022, Mr. Higgins authored another email missive to Mr. Pratt, where he laid out his long wish list of the roles and duties for the position of a Sales Executive, falsely claiming that this list was "precisely what you agreed to and what you wanted to do."  No such list of roles and duties was ever agreed to in advance of Mr. Pratt being forced to assume this title.  Mr. Higgins's email also ignored the fact that Mr. Pratt wanted to retain his title as the President of 3GL, but was instead demoted and forced to accept the position of a Sales Executive where he would serve as the brand ambassador and not a number-cruncher of weekly sales figures.

142.    On or about April 1, 2022, Mr. Pratt emailed Mr. Higgins and Mrs. Higgins, asking to be paid his March compensation.  He received no response.

143.    On or about April 2, 2022, Mr. Pratt received an email from Mr. Higgins who complained that Mr. Pratt was not answering his phone calls and emails, and threatened that "[f]ailure to promptly communicate and provide required information

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

1   will be deemed as deserting your position." Mr. Pratt understood this email to be

2   another pretext, in a long list of pretexts, for his ultimate termination from 3GL.

3   144. On or about April 3, 2022, Mr. Pratt responded to Mr. Higgins and shared

4   his concern that his not receiving pay, shifting and unreasonable job expectations,

5   demeaning communications and bullying were part of Mr. Higgins' efforts to retaliate

6   against him and make his work conditions miserable for raising questions about Mr.

7   Higgins' and Mrs. Higgins' business and accounting practices. Mr. Pratt explained that

8   he was suffering from serious health issues due to the stress of his job and the long-

9   term mistreatment from Mr. Higgins and Mrs. Higgins. Mr. Pratt reported that he was

10  currently seeing several health care professionals, including a cardiologist, and would

11  provide their recommendations for any workplace accommodations that may be

12  required. Mr. Pratt also requested that for the time being he preferred to communicate

13  with Mr. Higgins and Mrs. Higgins by email only, explaining that he finds their phone

14  conversations to be difficult and negatively impact his physical and mental health.

15  145. On or about April 4, 2022, Mr. Pratt was finally paid for March 2022.

16  Since April 4, 2022, Mr. Pratt received no further pay from 3GL and no

17  reimbursements of his owner contributions that remained outstanding.

18  146. On or about April 7, 2022, Damara Luce, Certified Physician Assistant

19  ("PA-C") issued a letter advising that Mr. Pratt was under her medical care at the

20  Gravenstein Community Health Center, and that "[d]ue to a health condition, he may

21  not work from Thursday, April 7, 2022 through Sunday May 1, 2022." The same day,

22  Mr. Pratt forwarded this letter to Mr. Higgins and Mrs. Higgins but received no

23  response.

24  147. Still on or about April 7, 2022, Mr. Pratt's access to all 3GL computer

25  systems was terminated, including email, Teams, SharePoint and others. Plaintiff is

26  informed and believes, and thereon alleges, that 3GL employees were instructed to re-

27  key the Santa Rosa facilities of 3GL and not allow Mr. Pratt onto the premises. As a

28  result, Mr. Pratt was unable to remove all his personal items from 3GL's premises.

148.   On or about April 20, 2022, Mr. Pratt was informed by a 3GL employee that the warehouse manager and staff at the Santa Rosa facilities were told to call the police if Mr. Pratt entered the premises, that all locks and alarm codes were changed, and that Mr. Pratt was banned from 3GL's premises.

149.   Plaintiff is informed and believes, and thereon alleges, that on or about April 21, 2022, Mr. Higgins or his agent(s) unlawfully accessed Mr. Pratts' Evernote internet account and gained access to some of Mr. Pratt's privileged communications with counsel, his personal diary, as well as Mr. Pratt's work and medical notes.  Mr. Pratt was then locked out of his Evernote account and permanently unable to reset his password and retrieve his Evernote account.

150.   Several days after the Evernote breach, Mr. Pratt was contacted by two concerned 3GL employees who asked if there was any way Mr. Higgins could have accessed Mr. Pratt's private journals, as Mr. Higgins was asking questions and making statements to these employees about Mr. Pratt of an extremely personal nature, including quoting Mr. Pratt's words.  Mr. Pratt's discovery of the Evernote breach reinforced his belief that it was Mr. Higgins and/or his agent(s) who have unlawfully accessed his privileged and confidential information. Mr. Pratt has been devastated by this breach of his personal privacy and attorney-client confidences.

151.   On or about April 30, 2022, Ms. Luce, PA-C, issued a follow up letter extending Mr. Pratt's medical leave until June 12, 2022, inclusive.  Mr. Pratt forwarded this letter to Mr. Higgins and Mrs. Higgins but received no response.

### 3GL's Damages

152.   Plaintiff is informed and believes, and thereon alleges, that the actions and omissions of Mr. Higgins, Mrs. Higgins, EHI and 3GI (collectively "Primary Defendants") have caused actual damages to 3GL and its members in the amount that exceeds $10,000,000, including but not limited to misappropriated and diverted corporate profits, intellectual property and business opportunities.

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

153. In addition, the Primary Defendants have also severely damaged the value of 3GL as a going concern due to, including but not limited to, the following:

    a. 3GL's profits are unreliable and depressed due to years of mismanagement and self-dealing;

    b. 3GL's books and records are not trustworthy;

    c. 3GL's rights to its intellectual property and the Artwork is in question due to illegal transfers of same to EHI;

    d. Damage to 3GL's Emerald Harvest and other brands caused by the Primary Defendants' conduct; and

    e. Damage to 3GL's reputation caused by the Primary Defendants' conduct.

154. Plaintiff conservatively estimates that acts and omissions of the Primary Defendants have reduced the value of 3GL as a going concern by at least $25,000,000.

**Mr. Pratt's Damages as Member of 3GL**

155. Separate and apart from the damages suffered by 3GL, Mr. Pratt suffered additional damages as a member of 3GL. Mr. Pratt received no profit distributions, did not receive all "guaranteed pay" promised to him by Mr. Higgins, and was not repaid all the owner contributions he has made since 2014 for the benefit of 3GL.

156. Plaintiff is informed and believes, and thereon alleges, that these actions and omissions of Mr. Higgins as manager of 3GL have caused actual damages to Mr. Pratt in an amount that exceeds $2,000,000.

**Plaintiff Seeks Punitive Damages on Behalf of 3GL**

157. Plaintiff, acting derivatively on behalf of 3GL, further seeks punitive damages against Mr. Higgins and Mrs. Higgins for their egregious and repeated breaches of fiduciary duty as pleaded in this Complaint. Plaintiff will recommend to

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

1   the jury to award punitive damages jointly and severally against Mr. Higgins and Mrs.

2   Higgins that are a multiple of the actual and consequential damages established at trial.

3

4                      **Plaintiff Seeks Recovery of Attorney's Fees and Costs**

5            158.   Plaintiff will seek the creation of a common fund for the benefit of 3GL

6   and its members.  The amount awarded as damages against Mr. Higgins, Mrs. Higgins,

7   3GI and EHI is to be deposited into this common fund.

8            159.   Once the common fund is established and funded, Plaintiff will seek an

9   order of this Court reimbursing his reasonable attorney's fees and costs incurred in

10  connection with this litigation out of the common fund, as allowed in derivative

11  actions where Plaintiff must expend his own funds to pursue an action for the benefit

12  of all members and the limited liability company.

13

14                              **FIRST CAUSE OF ACTION**

15        **(For Breach of Fiduciary Duty against Mr. Higgins and Mrs. Higgins)**

16           160.   Plaintiff repeats the allegations in Paragraphs 1 through 159 of this

17  Complaint, inclusive, as if fully set forth herein.

18           161.   Starting at the time of 3GL's formation and through present, Mr. Higgins

19  owed fiduciary duties to 3GL and its members, including Plaintiff, by virtue of serving

20  as officer and manager of 3GL, including but not limited to a duty of loyalty under

21  Corp. Code § 17704.09(b) and Corp. Code § 17704.09(f)(1), and a duty of care in the

22  conduct of the activities of the limited liability company under Corp. Code §

23  17704.09(c) and Corp. Code § 17704.09(f)(1).

24           162.   Starting in or about July 2021 and through present, Mrs. Higgins owed

25  fiduciary duties to 3GL and its members, including Plaintiff, by virtue of serving as an

26  officer, namely President, of 3GL.

27

28

163.    Based on these fiduciary relationships, 3GL and Plaintiff trusted Mr. Higgins and Mrs. Higgins to be loyal and act in good faith and in the best interests of 3GL and its members, including Plaintiff.

164.    Plaintiff is informed and believes, and thereon alleges, that Mr. Higgins and Mrs. Higgins knowingly breached their fiduciary duties to 3GL and Mr. Pratt as its member by: (1) false, fraudulent and deceptive alteration and writing of checks drawn on 3GL's business accounts for Mr. Higgins' and Mrs. Higgins' personal gain and to the detriment of 3GL; (2) making false, fraudulent, and deceptive entries in the books and records of 3GL; (3) secretly, fraudulently and deceptively asserting ownership rights over 3GL's intellectual property; (4) self-dealing and diverting business opportunities and financial resources away from 3GL and for their own personal gain and to the detriment of 3GL; (5) failing to use reasonable care in management of 3GL; (6) withholding profit distributions, guaranteed pay and repayment of owner contributions from Mr. Pratt as a member of 3GL, while falsely representing to Plaintiff that 3GL was not making enough money to make those payments, distributions and reimbursements; (7) assuming recourse liabilities on behalf of 3GL's members without consent of all members; (8) severely damaging the value of 3GL as a going concern through acts of mismanagement and fraud; and (9) other misconduct described above.

165.    Neither Plaintiff nor 3GL gave informed consent to Mr. Higgins' and Mrs. Higgins' wrongful conduct described above.

166.    Plaintiff timely exercised due diligence to discover the true state of financial and business affairs of 3GL upon Plaintiff's discovery of facts sufficient to put Plaintiff on notice that wrongful conduct was afoot.  At every step, Mr. Higgins and Mrs. Higgins stonewalled these efforts so as to hide the true facts from Plaintiff.

167.    Plaintiff is informed and believes, and thereon alleges, that as a direct and proximate cause of Mr. Higgins' and Mrs. Higgins' breaches of their fiduciary duties owed to 3GL and its members, including Plaintiff, 3GL was harmed in the

amount of at least $35,000,000, subject to proof at trial, which includes at least
$10,000,000 in misappropriated and converted funds, intellectual property and
business opportunities, and the additional damage of at least $25,000,000 to the value
of 3GL as a going concern.

168.   Mr. Higgins' and Mrs. Higgins' conduct was a substantial factor in
causing harm to 3GL and its members, including Mr. Pratt.

169.   Plaintiff is informed and believes, and thereon alleges, that in committing
the wrongful acts described herein, Mr. Higgins and Mrs. Higgins acted with
oppression, fraud and malice, justifying recovery of exemplary damages against Mr.
Higgins and Mrs. Higgins.

170.   Wherefore, Plaintiff prays for relief as set forth below.

## SECOND CAUSE OF ACTION

### (For **Breach of Duty of Good Faith and Fair Dealing**
### against **Mr. Higgins and Mrs. Higgins**)

171.   Plaintiff repeats the allegations in Paragraphs 1 through 170 of this
Complaint, inclusive, as if fully set forth herein.

172.   Starting at the time of 3GL's formation and through present, by virtue of
serving as a member of 3GL, Mr. Higgins had a duty of good faith and fair dealing to
3GL and its members, including Plaintiff.  (Corp. Code §§ 17704.09(d) and (f)(2)).

173.   Starting in or about February 2015 and through present, by virtue of
serving as a member of 3GL, Mrs. Higgins had a duty of good faith and fair dealing to
3GL and its members, including Plaintiff.  (Corp. Code §§ 17704.09(d) and (f)(2)).

174.   Based on these relationships, 3GL and Plaintiff trusted Mr. Higgins and
Mrs. Higgins to act in good faith and deal fairly in matters related to the interests of
3GL and its members, including Plaintiff.

175.   Plaintiff is informed and believes, and thereon alleges, that Mr. Higgins
and Mrs. Higgins knowingly breached their duties of good faith and fair dealing to

3GL and Mr. Pratt as its member by: (1) false, fraudulent and deceptive alteration and writing of checks drawn on 3GL's business accounts for Mr. Higgins' and Mrs. Higgins' personal gain and to the detriment of 3GL; (2) making false, fraudulent, and deceptive entries in the books and records of 3GL; (3) secretly, fraudulently and deceptively asserting ownership rights over 3GL's intellectual property; (4) acting in bad faith and dealing unfairly in connection with the management, business opportunities and financial resources of 3GL and its members, including Plaintiff; (5) withholding profit distributions, guaranteed pay and repayment of owner contributions from Mr. Pratt as a member of 3GL, while falsely representing to Plaintiff that 3GL was not making enough money to make those payments, distributions and reimbursements; (6) assuming recourse liabilities on behalf of 3GL's members without consent of all members; (7) severely damaging the value of 3GL as a going concern through acts of mismanagement and fraud; and (8) other misconduct described above.

176. Neither Plaintiff nor 3GL gave informed consent to Mr. Higgins' and Mrs. Higgins' wrongful conduct described above.

177. Plaintiff timely exercised due diligence to discover the true state of financial and business affairs of 3GL upon Plaintiff's discovery of facts sufficient to put Plaintiff on notice that wrongful conduct was afoot. At every step, Mr. Higgins and Mrs. Higgins stonewalled these efforts so as to hide the true facts from the Plaintiff.

178. Plaintiff is informed and believes, and thereon alleges, that as a direct and proximate cause of Mr. Higgins' and Mrs. Higgins' breaches of their duties of good faith and fair dealing owed to 3GL and its members, including Plaintiff, 3GL was harmed in the amount of at least $35,000,000, subject to proof at trial, which includes at least $10,000,000 in misappropriated and converted funds and business opportunities, and the additional damage of at least $25,000,000 to the value of 3GL as a going concern.

179. Mr. Higgins' and Mrs. Higgins' conduct was a substantial factor in causing harm to 3GL and its members, including Mr. Pratt.

180.   Plaintiff is informed and believes, and thereon alleges, that in committing the wrongful acts described herein, Mr. Higgins and Mrs. Higgins acted with oppression, fraud and malice, justifying recovery of exemplary damages jointly against Mr. Higgins and Mrs. Higgins.

181.   Wherefore, Plaintiff prays for relief as set forth below.

## THIRD CAUSE OF ACTION

### (For <u>Receiving Improper Distributions</u> (Corp. Code §§ 17704.05 & 17704.06) against Mr. Higgins and Mrs. Higgins)

182.   Plaintiff repeats the allegations in Paragraphs 1 through 181 of this Complaint, inclusive, as if fully set forth herein.

183.   From the respective dates of their acquisition of ownership interest in 3GL and through the present, Mr. Higgins and Mrs. Higgins owed a duty under Corp. Code § 17704.05 to not make or receive distributions of 3GL's profits that would render 3GL, as a result of making these distributions, unable to pay its debts as they become due in the ordinary course of its activities, or 3GL's total assets, as a result of making the distribution, would be less than the sum of its total liabilities plus the amount that would be needed to satisfy preferential rights on dissolution.

184.   Plaintiff is informed and believes, and thereon alleges, that Mr. Higgins and Mrs. Higgins received distributions of 3GL's profits by issuing checks to themselves, EHI, 3GI and third parties, as alleged above, knowing that these profit distributions were made in violation of Corp. Code § 17704.5.

185.   Plaintiff is informed and believes, and thereon alleges, that the improper profit distributions received by Mr. Higgins and Mrs. Higgins caused 3GL to be unable to pay its debts as they became due in the ordinary course of its activities, or 3GL's total assets, as a result of making the distribution, became less than the sum of its total liabilities plus the amount that would be needed to satisfy preferential rights on dissolution.

186.   As a result of the improper distribution alleged in this Complaint, Mr. Higgins and Mrs. Higgins are personally liable to 3GL under Corp. Code § 17704.06 to the extent that the distributions received by Mr. Higgins and Mrs. Higgins exceeded the amount that could have been properly paid under Corp. Code Section 17704.05, plus interest thereon at the legal rate on judgments.

187.   Wherefore, Plaintiff prays for relief as set forth below.

## FOURTH CAUSE OF ACTION

### (For Unjust Enrichment and Restitution against all Primary Defendants)

188.   Plaintiff repeats the allegations in Paragraphs 1 through 187 of this Complaint, inclusive, as if fully set forth herein.

189.   Plaintiff is informed and believes, and thereon alleges, that each of the Primary Defendants, including Mr. Higgins, Mrs. Higgins, EHI and 3GI, was unjustly enriched by unlawfully misappropriating 3GL's resources and business opportunities for the Primary Defendants' gain and benefit without in return providing goods, services, or opportunities of comparable value to 3GL.

190.   Plaintiff is informed and believes, and thereon alleges, that each of the Primary Defendants received fraudulent transfers of 3GL's funds and intellectual property for their own gain and benefit without in return providing goods or services of comparable value to 3GL.

191.   Plaintiff is informed and believes, and thereon alleges, that Mr. Higgins and Mrs. Higgins made fraudulent transfers of 3GL's funds and intellectual property to EHI, 3GI and third parties for their own gain and benefit without the Primary Defendants or said third parties providing in return to 3GL goods or services of comparable value.

192.   Plaintiff is informed and believes, and thereon alleges, that Mr. Higgins was unjustly enriched by fraudulent transfers of funds, intellectual property, business opportunities and control over 3GL's business to EHI and 3GI because Mr. Higgins is

1  the Chief Executive Officer and sole shareholder of EHI and 3GI and, on information

2  and belief, has dominant control over both EHI and 3GI.

3      193.   Plaintiff is informed and believes, and thereon alleges, that the Primary

4  Defendants are now liable for restitution because they did not confer any tangible

5  benefits to 3GL in exchange for these transfers.  Restitution under these circumstances

6  includes not only the restoration or giving back of all improper transfers made, but also

7  compensation, reimbursement, indemnification, and reparation for benefits derived

8  from, or for loss or injury caused to, 3GL as a consequence of these transfers.

9      194.   Wherefore, Plaintiff prays for relief as set forth below.

10

11              **FIFTH CAUSE OF ACTION**

12         **(For <u>Conversion</u> against all Primary Defendants)**

13      195.   Plaintiff repeats the allegations in Paragraphs 1 through 194 of this

14  Complaint, inclusive, as if fully set forth herein.

15      196.   Plaintiff is informed and believes, and thereon alleges, that the Primary

16  Defendants, and each of them, by means of: (1) false, fraudulent and deceptive

17  alteration and writing of checks drawn on 3GL's business accounts; (2) making false,

18  fraudulent, and deceptive entries in the books and records of 3GL; (3) secretly,

19  fraudulently and deceptively asserting ownership rights over 3GL's intellectual

20  property; (4) assuming recourse liabilities on behalf of 3GL's members without

21  consent of all members; (5) self-dealing and diverting business opportunities and

22  financial resources away from 3GL and for their own gain and to the detriment of 3GL;

23  and (6) other misconduct described above, misappropriated and converted to their own

24  use and possession, without 3GL's and Mr. Pratt's knowledge or consent, the sum in an

25  amount to be proven at trial, which sum belonged to 3GL and its members, including

26  Mr. Pratt.

27      197.   Plaintiff is informed and believes, and thereon alleges, that in committing

28  the wrongful acts described herein, the Primary Defendants acted with oppression,

1  fraud and malice, justifying recovery of exemplary damages jointly against the

2  Primary Defendants.

3      198.   Wherefore, Plaintiff prays for relief as set forth below.

4

5              **SIXTH CAUSE OF ACTION**

6         **(For Concealment against Mr. Higgins and Mrs. Higgins)**

7      199.   Plaintiff repeats the allegations in Paragraphs 1 through 198 of this

8  Complaint, inclusive, as if fully set forth herein.

9      200.   In their communications with 3GL and Mr. Pratt, Mr. Higgins and Mrs.

10 Higgins repeatedly blamed the business conditions and Mr. Pratt's alleged failure to

11 follow "established protocols" on lackluster profits and absence of profit distributions

12 to 3GL's members, along with a host of other manufactured reasons.

13     201.   Since at least 2015, Mr. Higgins and Mrs. Higgins assured 3GL and Mr.

14 Pratt that they are managing 3GL's business in full compliance with the law and with

15 the best interests of its members in mind.  Mr. Higgins and Mrs. Higgins also made

16 express and implied representations that they are maintaining accurate and complete

17 books and records of 3GL, and that the affairs and intellectual property of 3GL are

18 fairly managed.

19     202.   Plaintiffs are informed and believe, and thereon allege, that Mr. Higgins

20 and Mrs. Higgins were aware of some or all of the true facts concerning 3GL's

21 business and financial affairs at the time Mr. Higgins and Mrs. Higgins made the

22 express and implied representations alleged above.

23     203.   Plaintiffs are informed and believe, and thereon allege, that Mr. Higgins

24 and Mrs. Higgins intentionally concealed from 3GL and its members, including Mr.

25 Pratt, that at the time they made the express and implied representations alleged above,

26 Mr. Higgins and Mrs. Higgins have already been embezzling millions of dollars from

27 3GL's gross receipts and bank accounts, "cooking" the corporate books, engaging in

28 acts of self-dealing and fraud, misappropriating 3GL's intellectual property, assuming

1  recourse liabilities on behalf of 3GL's members without consent of all members, and

2  improperly taking profit distributions without distributing any profits to Mr. Pratt,

3  among other acts of wrongdoing alleged above.

4      204.   Because Mr. Pratt trusted Mr. Higgins to faithfully execute his fiduciary

5  obligations as a manger, officer and member of 3GL, Mr. Pratt trusted Mrs. Higgins to

6  faithfully execute her fiduciary obligations as officer and members of 3GL, and Mr.

7  Higgins and Mrs. Higgins kept the corporate books and records of 3GL, as well as all

8  foreign bank accounts, outside of Plaintiff's reach, Plaintiff was not aware of the true

9  material facts and motivations guiding Mr. Higgins and Mrs. Higgins.

10      205.   Plaintiff is informed and believes, and thereon alleges, that 3GL and its

11  members, including Plaintiff, were directly injured by and suffered damages from the

12  concealment perpetrated by Mr. Higgins and Mrs. Higgins in the amount according to

13  proof at trial.

14      206.   Wherefore, Plaintiff prays for relief as set forth below.

15

16  **SEVENTH CAUSE OF ACTION**

17  **(For <u>Accounting and Restitution</u> against all Primary Defendants)**

18      207.   Plaintiff repeats the allegations in Paragraphs 1 through 206 of this

19  Complaint, inclusive, as if fully set forth herein.

20      208.   Mr. Pratt is the holder of record of 25% membership interest in 3GL.  Mr.

21  Higgins is the holder of record of 51% membership interest in 3GL.  Mrs. Higgins is

22  the holder of record of 24% membership interest in 3GL.

23      209.   Mr. Higgins and Mrs. Higgins, are currently, and at all times relevant

24  herein have been, in total and complete control of 3GL, 3GI, EHI and 3GP.

25      210.   Plaintiff requests the Court to order an accounting of 3GL's affairs within

26  the limits of the applicable statutes of limitation, that the account be settled between

27  3GL and the Primary Defendants, and that Plaintiff have judgment for restitution

28

against the Primary Defendants for whatever sums may be found owing to 3GL and its members under the accounting.

211.   Wherefore, Plaintiffs pray for relief as set forth below.

## EIGHTH CAUSE OF ACTION

### (For <u>Dissociation</u> against Mr. Higgins and Mrs. Higgins)

212.   Plaintiff repeats the allegations in Paragraphs 1 through 211 of this Complaint, inclusive, as if fully set forth herein.

213.   Mr. Pratt is the holder of record of 25% membership interest in 3GL.  Mr. Higgins is the holder of record of 51% membership interest in 3GL.  Mrs. Higgins is the holder of record of 24% membership interest in 3GL.

214.   Mr. Higgins and Mrs. Higgins, as members of 3GL, have engaged and are engaging in wrongful conduct that has adversely and materially affected, and will adversely and materially affect, the business activities of 3GL.

215.   Mr. Higgins as a manager of 3GL, and Mrs. Higgins as a member of 3GL, have willfully and persistently committed, and are willfully and persistently committing, material breaches of their fiduciary duties.

216.   Mr. Higgins and Mrs. Higgins have engaged and are engaging in conduct relating to 3GL's business activities that makes it not reasonably practicable to carry on 3GL's business activities with Mr. Higgins and Mrs. Higgins as a manager or as members of 3GL.

217.   Wherefore, Plaintiff seeks involuntary expulsion of Mr. Higgins and Mrs. Higgins as a manager and members of 3GL and prays for relief as set forth below.

## NINTH CAUSE OF ACTION

### (For <u>Appointment of Receiver</u> against all Primary Defendants)

218.   Plaintiff repeats the allegations in Paragraphs 1 through 217 of this Complaint, inclusive, as if fully set forth herein.

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

219.    Plaintiff is a holder of 25% membership interest in 3GL, however he is excluded from most critical financial and business decisions and unable to act to preserve the viability of 3GL.

220.    Since at least 2015, Mr. Higgins and Mrs. Higgins have been in complete control of 3GL's revenues, property and business assets.  Mr. Higgins and Mrs. Higgins remain in complete control of 3GL today, as Mr. Pratt has been effectively excluded from participating in the management of 3GL, related decision-making, and the sharing in the profits of the business.

221.    All alleged above, Mr. Higgins and Mrs. Higgins were, and still are, using 3GL, including its personnel, facilities, intellectual property and revenue, for their own benefit and the benefit of EHI and 3GI.

222.    Mr. Higgins and Mrs. Higgins have already fraudulently transferred millions of dollars from 3GL's operating accounts into personal bank accounts, including tax havens and in Canada, outside of the reach of 3GL and Mr. Pratt.  Their conduct is not expected to change and it caused, and continues to cause, material damages to 3GL and its members.

223.    There is significant danger that 3GL's financial and property assets will be entirely dissipated and removed by Mr. Higgins and Mrs. Higgins, possibly in anticipation of having to pay damages as a consequence of this lawsuit.

224.    Plaintiff respectfully requests the Court appoint and instruct a receiver to: (1) take possession of 3GL, all other assets, books and records of 3GL; (2) manage 3GL and conduct its business in a lawful and reasonable manner; (3) conduct a forensic accounting of the profits and losses of 3GL within the applicable statutes of limitation; and (4) pursue action to recover all improper transfers of assets from 3GL to the Primary Defendants and third parties within the applicable statutes of limitation.

225.    Plaintiff is informed and believes, and thereon alleges, that unless a receiver is appointed and instructed as requested above, 3GL will be materially and irreparably damaged.  In addition, the parties hereto may be subjected to serious

personal liability to third parties for any injury or damage sustained by them as a result of business transactions unlawfully conducted by the Primary Defendants in the name of 3GL.

226.    Wherefore, Plaintiffs pray for relief as set forth below.

## **PRAYER FOR RELIEF**

Plaintiff is entitled to, and requests damages and other relief for the benefit of 3GL and its members by way of judgment as follows:

1.    ON THE FIRST CAUSE OF ACTION (Breach of Fiduciary Duty):

    (a)    For actual damages in an amount to be proved at trial;

    (b)    For consequential damages in an amount to be proved at trial;

    (c)    For exemplary and punitive damages in an amount appropriate to punish Mr. Higgins and Mrs. Higgins and set an example for others;

    (d)    For costs of suit herein incurred, including reasonable attorney's fees to be awarded out of a common fund;

    (e)    For pre- and post-judgment interest; and

    (f)    For such other and further relief as the Court deems just and proper.

2.    ON THE SECOND CAUSE OF ACTION (Breach of Duty of Good Faith and Fair Dealing):

    (a)    For actual damages in an amount to be proved at trial;

    (b)    For consequential damages in an amount to be proved at trial;

    (c)    For exemplary and punitive damages in an amount appropriate to punish Mr. Higgins and Mrs. Higgins and set an example for others;

    (d)    For costs of suit herein incurred, including reasonable attorney's fees to be awarded out of a common fund;

    (e)    For pre- and post-judgment interest; and

    (f)    For such other and further relief as the Court deems just and proper.

3.    ON THE THIRD CAUSE OF ACTION (Receiving Improper Distributions):

    (a)    For actual damages in an amount to be proved at trial, to be apportioned among Mr. Higgins and Mrs. Higgins according to the improper distributions received by each of them;

    (b)    For costs of suit herein incurred, including reasonable attorney's fees to be awarded out of a common fund;

    (c)    For pre- and post-judgment interest; and

    (d)    For such other and further relief as the Court deems just and proper.

4.    ON THE FOURTH CAUSE OF ACTION (Unjust Enrichment):

    (a)    For restitution to 3GL and its members of any money and property according to proof;

    (b)    For other equitable relief as appropriate;

    (c)    For costs of suit herein incurred, including reasonable attorney's fees to be awarded out of a common fund;

    (d)    For such other and further relief as the Court deems just and proper.

5.    ON THE FIFTH CAUSE OF ACTION (Conversion):

    (a)    For actual damages in an amount to be proved at trial;

    (b)    For consequential damages in an amount to be proved at trial;

    (c)    For exemplary and punitive damages in an amount appropriate to punish the Primary Defendants and set an example for others;

    (d)    For costs of suit herein incurred, including reasonable attorney's fees to be awarded out of a common fund;

    (e)    For pre- and post-judgment interest; and

    (f)    For such other and further relief as the Court deems just and proper.

6.    ON THE SIXTH CAUSE OF ACTION (Concealment):

    (a)    For actual damages in an amount to be proved at trial;

    (b)    For consequential damages in an amount to be proved at trial;

    (c)    For costs of suit herein incurred, including reasonable attorney's fees to

1          be awarded out of a common fund;

2    (d)    For pre- and post-judgment interest; and

3    (e)    For such other and further relief as the Court deems just and proper.

4  7.    ON THE SEVENTH CAUSE OF ACTION (Accounting and Restitution):

5    (a)    For an accounting of 3GL's affairs within the limits of the applicable

6          statutes of limitation and that the account be settled between 3GL, Mr.

7          Higgins Mrs. Higgins, EHI and 3GI;

8    (b)    For judgment for restitution against Mr. Higgins, Mrs. Higgins, 3HI and

9          3GI for whatever sums may be found owing to 3GL and its members

10         under the accounting;

11    (c)    For costs of suit herein incurred;

12    (d)    For pre- and post-judgment interest; and

13    (e)    For such other and further relief as the Court deems just and proper.

14  8.    ON THE EIGHTH CAUSE OF ACTION (Dissociation):

15    (a)    For involuntary expulsion of Mr. Higgins and Mrs. Higgins as a manager

16         and members of 3GL

17    (b)    For actual damages in an amount to be proved at trial;

18    (c)    For consequential damages in an amount to be proved at trial;

19    (d)    For costs of suit herein incurred, including reasonable attorney's fees to

20         be awarded out of a common fund;

21    (e)    For pre- and post-judgment interest; and

22    (f)    For such other and further relief as the Court deems just and proper.

23  9.    ON THE NINTH CAUSE OF ACTION (Appointment of Receiver):

24    (a)    That the Court decree a receiver be appointed to: (1) take possession of

25         3GL, all other assets, books and records of 3GL; (2) manage 3GL and

26         conduct its business in a lawful and reasonable manner; (3) conduct a

27         forensic accounting of the profits and losses of 3GL within the applicable

28         statutes of limitation; and (4) pursue action to recover all improper

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

1    transfers of assets from 3GL to the Primary Defendants and third parties

2    within the applicable statutes of limitation.

3    (b)   For costs of suit herein incurred; and

4    (c)   For such other and further relief as the Court deems just and proper.

5

6    ANDERSON ZEIGLER
     A Professional Corporation

7

8    Date: 6/15/22    By _____

9    Michael Shklovsky
     Attorneys for Plaintiff

---

53

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

1

## VERIFICATION

2

3       I, David Pratt, am the plaintiff in this lawsuit.  I have read the foregoing Complaint and

4   know the contents thereof.  The same is true of my own knowledge, except as to those matters

5   which are therein stated on information and belief, and as to those matters, I believe them to be

6   true.

7

8       I declare under penalty of perjury under the laws of the State of California that the

9   foregoing is true and correct.

10

11  Date: 6/15/22                                   _____

12                                                       David Pratt

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED DERIVATIVE COMPLAINT AGAINST ROBERT C. HIGGINS, ET AL.

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Robert C. Higgins, an individual; Sharon E. Higgins, an individual; 3G Green Garden Group, Inc., a Canadian Corporation; Emerald Harvest, Inc., a Canadian Corporation and DOES 1-50, inclusive, and 3G Green Garden Group, LLC D.B.A. Emerald Harvest, a California Limited Liability Company

**YOU ARE BEING SUED BY PLAINTIFF:**

*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

David Pratt, an individual, derivatively on behalf of 3G Green Garden Group, LLC D.B.A Emerald Harvest a California Limited Liability Company

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**ELECTRONICALLY FILED**
**Superior Court of California**
**County of Sonoma**
**6/15/2022 2:49 PM**
**By: Cyndi Nguyen, Deputy Clerk**

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center *(www.courtinfo.ca.gov/selfhelp)*, your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site *(www.lawhelpcalifornia.org)*, the California Courts Online Self-Help Center *(www.courtinfo.ca.gov/selfhelp)*, or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

**CASE NUMBER**
*(Número del Caso):* **SCV-271011**

The name and address of the court is:
*El nombre y dirección de la corte es):*

Sonoma County Superior Court
600 Administration Drive
Santa Rosa, CA 95403

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Michael Shklovsky (SBN 255893) Anderson Zeigler, A Professional Corporation
50 Old Courthouse Sq., 5th Fl. (707) 545-4910
Santa Rosa, CA 95404

DATE: 6/15/2022 2:49 PM
*(Fecha)*

Clerk, by **Cyndi Nguyen**
*(Secretario)*

, Deputy
*(Adjunto)*

For proof of service of this summons, use Proof of Service of Summons *(form POS-010).)*
*Para prueba de entrega de esta citación use el formulario* Proof of Service of Summons, *(POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

**SUMMONS**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

CEB® Essential Forms
ceb.com

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA<br>CIVIL DIVISION<br>600 ADMINISTRATION DRIVE, ROOM 107-J<br>SANTA ROSA, CALIFORNIA 95403-2878<br>(707) 521-6500<br>http://www.sonoma.courts.ca.gov<br><br>Pratt vs Higgins | (FOR COURT USE ONLY)<br><br>**FILED**<br><br>JUN 16 2022<br><br>SUPERIOR COURT OF CALIFORNIA,<br>COUNTY OF SONOMA<br>BY _____ DEPUTY CLERK |
|---|---|
| **NOTICE OF ASSIGNMENT TO ONE JUDGE FOR ALL PURPOSES,<br>NOTICE OF CASE MANAGEMENT CONFERENCE,<br>and ORDER TO SHOW CAUSE** | Case number:<br>SCV-271011 |

## A COPY OF THIS NOTICE MUST BE SERVED WITH THE SUMMONS AND COMPLAINT AND WITH ANY CROSS-COMPLAINT

1. **THIS ACTION IS ASSIGNED TO HON. BRADFORD DEMEO FOR ALL PURPOSES.**
Pursuant to California Rules of Court, Rule 2.111(7), the assigned judge's name must appear below the number of the case and the nature of the paper on the first page of each paper presented for filing.

2. EACH DEFENDANT MUST FILE A WRITTEN RESPONSE TO THE COMPLAINT AS REQUIRED BY THE SUMMONS.

   A Case Management Conference has been set at the time and place indicated below:

| Date: Thursday, 10/20/2022 | Time: 3:00 PM | Courtroom 17 |
|---|---|---|
| Location: 3035 Cleveland Avenue, Santa Rosa. CA 95403 | | |

3. No later than 15 calendar days before the date set for the case management conference or review, each party must file a case management statement [Judicial Council form #CM-110] and serve it on all other parties in the case. In lieu of each party's filing a separate case management statement, any two or more parties may file a joint statement.

4. At the conference, counsel for each party and each self-represented party must appear personally or by telephone [California Rules of Court, Rule 3.670(c)(2)]; must be familiar with the case; and must be prepared to discuss and commit to the party's position on the issues listed in California Rules of Court, Rule 3.727.

5. Pre-approved dispositions are recorded three (3) court days prior to the case management conference. These may be obtained by calling (707) 521-6606 or by going to http://sonoma.courts.ca.gov/online-services/tentative-rulings.

## ORDER TO SHOW CAUSE

To Plaintiff(s), Cross-complaints, and/or their attorneys of record:
If, on the date shown above, you are not in compliance with the requirements stated in the California Rules of Court, rules 2.30, 3.110, and/or 3.720 through 3.771 inclusive, you must then and there show cause why this court should not impose monetary and/or terminating sanctions in this matter.

Pursuant to California Rule of Court, rule 3.221(b), information and forms related to Alternative Dispute Resolution are available on the Court's website at http://www.sonoma.courts.ca.gov/self-help/adr.

## ELECTRONIC SERVICE OF DOCUMENTS

### Enabled by Local Rule 18.16

Voluntary e-service is available in Sonoma County. The Court has pre-approved a Stipulation for cases in which the attorneys or parties choose e-service. A copy of the Stipulation is available under the "Civil" section in the "Division" tab of the Court website: http://www.sonoma.courts.ca.gov. The advantages of e-service to the parties include:

| | |
|---|---|
| **SAVE MONEY** | Reduction in costs related to photocopying, retrieving, storing, messenger and postage fees. No special software is needed to use e-service |
| **SAVE TIME** | Instant service of your documents on all parties |
| **SAVE SPACE** | With 24/7 internet access to all documents, you do not need to house paper copies |
| **GAIN CERTAINTY** | Immediate confirmation of service for your records. Documents are not delayed in the mail or blocked by email spam blockers and firewalls |

To take advantage of e-service, select an e-service provider and file the signed Stipulation with the Court. Parties can then e-serve documents through the selected provider. Information about e-service providers is available at the website for the Sonoma County Bar Association: http://www.sonomacountybar.org. The Court does not endorse one provider over another.

**To learn more about available e-service providers and their fees, please visit their website**

*Note: Hard-copy pleadings are required to be filed with the Court in accordance with applicable provisions of the Code of Civil Procedure, California Rules of Court and local rules. You do not need to provide a courtesy copy of a served document to the specific department in which the matter has been assigned.*

## DISCOVERY FACILITATOR PROGRAM

Effective January 1, 2008, the Sonoma County Superior Court promulgated Sonoma County Local Rule 4.14 which established the Discovery Facilitator Program. Participation in the Discovery Facilitator Program shall be deemed to satisfy a party's obligation to meet and confer under Sonoma County Local Rule 5.5 and applicable provisions of the Code of Civil Procedure and California Rules of Court. This program has been providing assistance in resolving discovery disputes and reducing the backlog of matters on the law and motion calendars in our civil law departments. The Sonoma County Superior Court encourages all attorneys and parties to utilize the Discovery Facilitator Program in order to help resolve or reduce the issues in dispute whether or not a discovery motion is filed.

There is a link to Local Rule 4.14 and the list of discovery facilitator volunteers on the official website of the Sonoma County Superior Court at http://www.sonoma.courts.ca.gov. On the home page, under the "AVAILABLE PROGRAMS & HELP" section, click on »Discovery Facilitator Program. You can then click on either "Local Rule 4.14" to obtain the language of the local rule, or "List of Facilitators" for a list of the volunteer discovery facilitators and accompanying contact and biographical information.

**Pursuant to Local Rule 5.1.C**:

The moving party shall, on the date of filing, hand-deliver to the Assigned Judge a courtesy copy, which need not be file-endorsed, of any motion filed. The responding party shall, on the date of filing, hand-deliver to the Assigned Judge a courtesy copy, which need not be file-endorsed, of all opposition papers. Finally, the moving party shall, on the date of filing, hand-deliver to the Assigned Judge a courtesy copy, which need not be file-endorsed, of all reply papers.

**Pursuant to Local Rule 5.1.C.1**:

If any matter scheduled on the law and motion calendar is resolved, dismissed, settled or becomes moot for any reason, the moving party shall immediately notify the judicial assistant for the Assigned Judge if the motion is to be dropped from the law and motion calendar. Said notification may be made by telephone, followed by a letter of confirmation.

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Michael Shklovsky, (255893), Rose M. Zoia, (134759), Christopher M. Mazzia (95513)<br>ANDERSON ZEIGLER, A Professional Corporation<br>50 Old Courthouse Square, 5th Floor<br>Santa Rosa, CA  95404<br>TELEPHONE NO.: 707-545-4910     FAX NO. *(Optional):* 707-544-0260<br>E-MAIL ADDRESS *(Optional):* mshklovsky@andersonzeigler.com; rzoia@andersonzeigler.c<br>ATTORNEY FOR *(Name):* Plaintiff David Pratt | FOR COURT USE ONLY<br><br>**ELECTRONICALLY FILED**<br>**Superior Court of California**<br>**County of Sonoma**<br>**6/24/2022 4:50 PM**<br>By: Alex Fleckenstein, Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SONOMA
STREET ADDRESS:  600 Administration Dr., Room 107J
MAILING ADDRESS:  same as above
CITY AND ZIP CODE:  Santa Rosa, CA 95403
BRANCH NAME:  Civil Division

| PLAINTIFF/PETITIONER: David Pratt, an individual, derivatively on, et al. | CASE NUMBER:<br>SCV 271011 |
| DEFENDANT/RESPONDENT: Robert C. Higgins, an individual; Sharon E., et al. | |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>CMC 10/20/2022 @3 PM, #17 |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:

    a. ☑ summons

    b. ☑ complaint

    c. ☑ Alternative Dispute Resolution (ADR) package

    d. ☑ Civil Case Cover Sheet *(served in complex cases only)*

    e. ☐ cross-complaint

    f. ☑ other *(specify documents):* Notice of Availability of Court-Provided Court Reporters

3. a. Party served *(specify name of party as shown on documents served):*

    3G GREEN GARDEN GROUP, LLC, a California Limited Liability Company

    b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*

    Augustine O. (Person-in-Charge/Hisp. male, 5'7", 120 lbs., glasses, dark hair, 22-27 yrs.)

4. Address where the party was served:
    975 Corporate Center, Suite 140, Santa Rosa, CA  95407

5. I served the party *(check proper box)*

    a. ☐ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):*          (2) at *(time):*

    b. ☑ **by substituted service.** On *(date):* 06/23/2022   at *(time):* 4:18 PM I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

    Augustine O. (Person-in-Charge/Hisp. male, 5'7", 120 lbs., glasses, dark hair, 22-27 yrs.)

    (1) ☑ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

    (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

    (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

    (4) ☑ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):* 6/23/2022 from *(city):* Santa Rosa      or ☐ a declaration of mailing is attached.

    (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10 |

| PLAINTIFF/PETITIONER: David Pratt, an individual, derivatively on, et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Robert C. Higgins, an individual; Sharon E., et al. | SCV 271011 |

5.  c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

      (1)  on *(date):*                  (2)  from *(city):*

      (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.*)* (Code Civ. Proc., § 415.30.)

      (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

  d. ☐ **by other means** *(specify means of service and authorizing code section):*

     ☐ Additional page describing service is attached.

6.  The "Notice to the Person Served" (on the summons) was completed as follows:
  a. ☐ as an individual defendant.
  b. ☐ as the person sued under the fictitious name of *(specify):*
  c. ☐ as occupant.
  d. ☑ On behalf of *(specify):*  3G GREEN GARDEN GROUP, LLC
     under the following Code of Civil Procedure section:

     ☐ 416.10 (corporation)            ☐ 415.95 (business organization, form unknown)
     ☐ 416.20 (defunct corporation)       ☐ 416.60 (minor)
     ☐ 416.30 (joint stock company/association)  ☐ 416.70 (ward or conservatee)
     ☐ 416.40 (association or partnership)    ☐ 416.90 (authorized person)
     ☐ 416.50 (public entity)              ☐ 415.46 (occupant)
                                  ☑ other: a California Limited Liability Company

7.  **Person who served papers**
  a.  Name: K Doherty Buskirk-Fast Track Attorney & Legal Support Services
  b.  Address: 509 Orchard Street, Santa Rosa, CA  95404
  c.  Telephone number: 707-528-8663
  d.  **The fee** for service was: $ 75.00
  e.  I am:

     (1) ☐ not a registered California process server.
     (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
     (3) ☑ a registered California process server:
       (i) ☑ owner  ☐ employee  ☐ independent contractor.
       (ii)  Registration No.: P-478
       (iii)  County: Sonoma

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

     or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: 06/23/2022

K. Doherty Buskirk
   (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)              (SIGNATURE )